OPINION
{¶ 1} After The Ohio State University ("OSU") fired former men's basketball coach James J. O'Brien ("O'Brien"), O'Brien brought suit against OSU alleging it *Page 2 
breached his employment contract, which had three years remaining on its term. OSU argued that it was O'Brien who breached the contract when he made a loan to a Serbian basketball recruit in 1998, and failed to disclose it until 2004, which OSU believed was an egregious violation of the National Collegiate Athletic Association ("NCAA") rules constituting a material breach of the employment contract such that OSU was entitled to terminate O'Brien's employment immediately.
 {¶ 2} Original jurisdiction over this claim lay with the Ohio Court of Claims, which held a bench trial to determine liability. Following the trial, the court determined that the loan (and failure to disclose) was the sole cause for O'Brien's termination, and that O'Brien's conduct and breach were not a material breach of the contract so that OSU would have cause to terminate the contract immediately. O'Brien v. The Ohio StateUniv., Ct. of Cl. No. 2004-10230, 2006-Ohio-1104 (hereafter "Liability"). OSU did not dispute that O'Brien's intentions in making the loan were humanitarian, that his conduct was not motivated by desire to gain a recruiting advantage in basketball, and, further, that the loan recipient was not even eligible to participate in intercollegiate athletics at the time of the loan because the recipient was a professional athlete. Thus, although O'Brien breached his contract by making the loan, the court determined that the breach was not "material," and that OSU was without cause to terminate him on that basis alone.
 {¶ 3} Following the bench trial, the trial court rendered a verdict for O'Brien, and both parties filed motions for summary judgment as to damages. O'Brien v. Ohio State Univ., 139 Ohio Misc.2d 36,2006-Ohio-4346, at ¶ 1-3 (hereafter "Damages"). The trial *Page 3 
court found the employment contract clearly and unambiguously contemplated the amount of damages OSU would owe to O'Brien in the event he was terminated without "cause," as defined by the contract; thus, there was no dispute as to any material fact in that regard. Construing the evidence in a light most favorable to OSU, the trial court found that reasonable minds could come to but one conclusion — that conclusion being that O'Brien was entitled to judgment as a matter of law. The trial court granted, in part, O'Brien's motion for summary judgment as to damages, and entered judgment in the amount of $2,253,619.45, plus pre-judgment interest of $241,353.98, for a total judgment of $2,494,972.83. O'Brien v. Ohio State Univ., Ct. of Cl. No. 2004-10230,2006-Ohio-4737, Final Entry, Aug. 18, 2006, at ¶ 2, 10 (hereafter "Final Entry"). OSU and O'Brien, both, have appealed from that judgment and decision.
 {¶ 4} Appellant OSU presents two assignments of error for our review:
 I. The Court of Claims erred by holding that O'Brien did not materially breach his employment contract — which clearly and unambiguously required that he run a clean and compliant program and immediately report any NCAA violations — when he gave an impermissible $6,000 cash inducement to the family of a basketball recruit in 1998 and then failed to report that violation to the University for more than five years.
 II. The Court of Claims erred by holding that the after-acquired evidence of O'Brien's additional, pervasive misconduct, as confirmed by the NCAA in March of 2006, did not bar O'Brien's claim altogether. *Page 4 
 {¶ 5} O'Brien also cross-appeals from the trial court's partial grant of his motion for summary judgment, contending that the court miscalculated the amount of liquidated damages. He raises the following assignments of error:
 [I.] The trial court erred as a matter of law in failing to properly calculate the amount of damages due to the Plaintiff Jim O'Brien pursuant to the liquidated damages provisions contained in his Employment Agreement.
 [II.] The trial court erred as a matter of law in finding that the Defendant University was entitled to a setoff for certain bonus amounts previously paid to Plaintiff Jim O'Brien.
 I. {¶ 6} Our scope of review is limited to examination of the transcript from the proceedings, and the remainder of the trial court record, which includes the evidence admitted at trial, and to some extent, the evidence excluded by the trial court, provided such evidence was proffered, preserving it for our review.
 {¶ 7} The law is well settled that we review evidentiary matters with an abuse-of-discretion standard. State v. Drummond, 111 Ohio St.3d 14,2006-Ohio-5084 ("[T]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court"), quoting State v.Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus; State v.Swann, 171 Ohio App.3d 304, 2007-Ohio-2010, at ¶ 41. An abuse of discretion is more than an error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable, or that there was "no sound reasoning process" to support the trial court's ruling. See, e.g., AAAA Enterprises., Inc. v.River *Page 5 Place Community Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157,161; see, also, Pilz v. Dept. of Rehab. Corr, Franklin App. No. 04AP-240, 2004-Ohio-4040, citing Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 8} Similarly, we accept each finding of fact made by the trial court as issued in the decision of the trial court, provided those findings are supported by "some competent credible evidence."Columbus Homes Ltd. v. S.A.R. Constr. Co., Franklin App. No. 06AP-759,2007-Ohio-1702, at ¶ 52, quoting C. E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279.
 {¶ 9} Counsel for OSU has urged this court to toss out the trial court's findings of fact and to re-examine the entire case de novo. However, de novo is not the appropriate standard of review given the issues at bar. Although contract interpretation is a question of law, which does receive de novo review on appeal, the terms of the contract are not in dispute here. Nationwide Mut. Fire Ins. Co. v. Guman Bros.Farm (1995), 73 Ohio St.3d 107, 108. The issue here is whether OSU acted in accordance with those undisputed contractual terms when firing O'Brien, which ultimately turns on whether O'Brien's breach was material. This is a question of fact, which must be determined after weighing the evidence, and the credibility of witnesses. E.g., State v.Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 24. Ours is not the job of re-trying the case, or re-weighing the testimony of witnesses and evidence that were already weighed; rather, we conduct an independent review of everything that transpired in the case to determine whether the trial court committed reversible error that would necessitate granting a new trial. Id.; Hardy v. *Page 6 Fell, Cuyahoga App. No. 88063, 2007-Ohio-1287, at ¶ 29 ("This court will not sit as trier of fact de novo"). De novo review is therefore inappropriate here. Counsel for OSU further argues that "whether a breach of a contract is material is a mixed question of law and fact that is also reviewed de novo," for which counsel cites an 87-year-old case from another jurisdiction.
 {¶ 10} Counsel is correct in noting that some issues are mixed questions of law and fact, and that, in such circumstances, a hybrid standard of review may be appropriate. State v. Burnside,100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8 (holding that appellate review of a suppression motion is a mixed question of law and fact). This court, however, is not a trial court, and we cannot be the de novo trier of fact. Hardy, supra. Trial courts have the traditional role as the trier of fact because they are "in the best position to resolve factual questions and evaluate the credibility of witnesses." Burnside, supra, quoting State v. Mills (1992), 62 Ohio St.3d 357, 366. Consequently, we review the trial court's findings of fact to the extent necessary to determine if the findings are supported by competent, credibleevidence. Id., quoting State v. Fanning (1982), 1 Ohio St.3d 19;Columbus Homes Ltd., supra. "Mere disagreement with the trial court's findings is not sufficient to overturn them." Wilson, at ¶ 40. (Emphasis added.)
 {¶ 11} The determination of whether a party's breach of a contract was a "material breach" is generally a question of fact. See Kersh v.Montgomery Developmental Center (1987), 35 Ohio App.3d 61, 63. That has been the law for at least two decades, and it has been upheld by other courts. Klaus v. Hilb, Rogal Hamilton Co. of Ohio (S.D.Ohio *Page 7 
2006), 437 F.Supp.2d 706, 730-731; Lewis Michael Moving and Storage,Inc. v. Stofcheck Ambulance Serv., Inc., Franklin App. No. 05AP-662,2006-Ohio-3810, at ¶ 20-22; see, also, Williston on Contracts (4th Ed.1990), Section 63:3; E. Allan Farnsworth, Contracts (1982), Sections 8.16-18, at 612. The reasoning behind this principle is that to determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith. Id. All of these inquiries turn on subjective facts.
 {¶ 12} If we accept the facts found in the trial court as true, we must then independently determine — without deference to the trial court's conclusion — whether those facts satisfy the trial court's legal conclusion. Burnside, supra. We must not, however, simply re-weigh the evidence, substituting our own judgment for that of the trial court.Wilson, ibid.
 II. {¶ 13} Turning to the evidence, in April 1997, OSU hired O'Brien as head men's basketball coach. When O'Brien arrived at OSU, the men's basketball program was, by his own account, "not in great shape" and, in fact, OSU had not been to the Final Four in men's basketball in nearly three decades. (Tr. 84, 201.)
 {¶ 14} O'Brien's first season as head coach at OSU was the 1997-1998 season, which O'Brien described as "not very bright." Indeed, the team won only eight games that year. (Tr. 84, 85, 200.) The following year, O'Brien turned the Buckeyes around. From *Page 8 
winning only one-fourth of their games in 1997-1998, the 1998-1999 team won more games than any other Buckeye men's basketball team in history. (Tr. 200-201.) That year, O'Brien led the Buckeyes to a Big Ten conference title, and an NCAA tournament berth culminating in a trip to the Final Four. O'Brien was named 1999 National Coach of the Year, and received numerous other coaching awards and accolades. (Tr. 85, 200-201.) Obviously, OSU was pleased with O'Brien, which was evidenced by the fact that Andy Geiger, Ohio State's Director of Athletics ("Geiger"), approached O'Brien immediately after the 1998-1999 season to offer him a new contract, despite the fact that he still had three years remaining on his then-current contract. Id. Geiger testified that, after the 1998-1999 season, he was extremely "enthusiastic about O'Brien," and "enthusiastic about [OSU's] basketball program" because they had just gone to the Final Four. Geiger told the trial court that he initiated talks about a new contract with O'Brien because he "was anxious to have [Coach O'Brien] feel good about Ohio State." (Tr. 200.)
 {¶ 15} The terms of the new contract were negotiated over several months, and the final version of the agreement was delivered to O'Brien for his approval on or about October 1, 1999. The new contract took effect just prior to the 1999-2000 season, and it was the parties' intent that the new contract supersede the previous contract for O'Brien in toto. (Tr. 86-87.) This new contract was substantially superior to the previous contract because it extended O'Brien's tenure at OSU by five years, through the 2007 season, and markedly raised his salary, guaranteeing that he receive total compensation in the neighborhood of $800,000 per year, plus incentives. (1999 Employment Agreement, at *Page 9 
Section 3.0 [hereafter "contract"]). In addition, the 1999 contract put strict limitations on the circumstances under which O'Brien could be terminated prior to the end of the contract's term. Id; see, also, Damages, 2006-Ohio-4346, at ¶ 34 ("The contract is extremely favorable to plaintiff, but it is not unreasonable"). Specifically, under the new contract, OSU could not terminate O'Brien without "cause," which was defined in Section 5.1 thereof:
 Termination for Cause — Ohio State may terminate this agreement at any time for cause, which, for the purposes of this agreement, shall be limited to the occurrence of one or more of the following:
 (a) a material breach of this agreement by Coach, which Coach fails to remedy to OSU's reasonable satisfaction, within a reasonable time period, not to exceed thirty (30) days, after receipt of a written notice from Ohio [S]tate specifying the act(s), conduct or omission(s) constituting such breach;
 (b) a violation by Coach * * * of applicable law, policy, rule or regulation of the NCAA or the Big Ten Conference which leads to a "major" infraction investigation by the NCAA or the Big Ten Conference and which results in a finding by the NCAA or the Big Ten Conference of lack of institutional control over the men's basketball program or which results in Ohio State being sanctioned by the NCAA or the Big Ten Conference * * * .
 {¶ 16} Notwithstanding Section 5.1, OSU could terminate O'Brien without cause, but, if so, would be obligated to pay O'Brien liquidated damages. Collectively, Sections 5.2 and 5.3 provided the formula for the calculation of liquidated damages, in the event *Page 10 
OSU decided to terminate O'Brien for any reason(s) other than those described in Section 5.1:
 5.2 Termination Other Than For Cause/Partial Liquidated Damages. If Coach's employment hereunder is terminated by Ohio State other than for cause (as delineated in Section 5.1 above), Ohio State shall pay and provide to Coach, as partial liquidated damages * * * (i) the full amount of Coach's then-current base salary (see Section 3.0 above) and (ii) such normal employee benefits as Ohio State then provides generally to its administrative and professional employees * * *.
 5.3 Termination Other than for Cause/Additional Liquidated Damages. If Coach's employment is terminated other than for cause (as delineated in Section 5.1 above), in addition to the liquidated damages to be paid and provided by Ohio State pursuant to Section 5.2 above, Ohio State shall compensate Coach for the loss of collateral business opportunities (whether media, public relations, camps, clinics, apparel or similar contracts, sponsorships or any other supplemental or collateral compensation or benefit of any kind) by paying Coach as additional liquidated damages * * *[.]
 * * *
 b. an amount equal to three and a half (3.5) times the product of (y) the Coach's then current base salary * * * and (z) the number of years remaining under the term of this agreement * * *, if Coach's employment is terminated after June 30, 2003.
 Such amount shall be paid in a lump sum within thirty (30) days after termination of Coach's employment hereunder, and shall be in lieu of any other obligation of Ohio State * * * .
(Emphasis sic.) *Page 11 
 {¶ 17} The events that gave rise to this case, however, all transpired before the negotiation and execution of the 1999 contract.
 {¶ 18} When O'Brien arrived in Columbus in the spring of 1997, the OSU men's basketball program was in disarray, and it was his responsibility, as head coach, to change that. (Tr. 787.) Although winning is arguably every head coach's first priority, Division-I[1] college sports coaches have a number of responsibilities beyond what they do on the court or at game time. (Contract, Section 4.0 et seq.) O'Brien cited a host of duties for which he was responsible as the head coach at OSU: The first one — "Win," the second — "Recruit student-athletes." (Tr. 81.)
 {¶ 19} Shortly after the close of the dismal 1997-1998 season, 21-year-old Alex Radojevic arrived at OSU's campus for an unofficialrecruiting visit[2] Radojevic hailed from the Republic of Serbia,[3]
stood seven-feet-three-inches tall, and, at the time, played Division-III basketball at a community college in Kansas. Radojevic came to visit OSU because he wanted to transfer to a Division-I school, to get the kind of national exposure that would improve his chances for the NBA draft. Given his size alone, Radojevic was seen as a "difference maker," and he was heavily recruited by a number of top schools. *Page 12 
 {¶ 20} O'Brien and his staff began recruiting Radojevic, and visited him in Kansas while on an official recruiting tour in early September 1998. While O'Brien was visiting Radojevic, Radojevic received word from Serbia that his father had passed away. (Tr. 126.) O'Brien was sympathetic toward Radojevic, who wanted badly to return home to his mother and family, but could not go back because of the likelihood that the government would force him into military service amidst the ongoing war in Yugoslavia.[4] (Tr. 127.) O'Brien was already familiar with Radojevic's plight because Slobodan "Boban" Savovic, a then-current member of O'Brien's team, gave almost daily reports of the situation, and Savovic was purportedly from the same geographical region as Radojevic. Id.
 {¶ 21} Shortly after his September 1998 recruiting tour, O'Brien received information that Radojevic had signed a professional basketball contract with a Yugoslavian team in 1996, that he had played for that team, albeit sparsely, and was compensated in consideration of his service. If true, this meant that Radojevic could not play for OSU (or any college) because signing a professional sports contract instantly *Page 13 
strips that player of his amateur status, a baseline requirement to be eligible to play collegiate sports in the NCAA.[5]
 {¶ 22} Despite speculation that Radojevic had "professionalized" himself, O'Brien and his staff continued their recruiting efforts, apparently in the hopes that OSU could petition the NCAA to have him reinstated. To make a successful case, the school seeking the athlete's reinstatement must file an application with the NCAA's reinstatement department presenting facts and circumstances that mitigate both the player's professional involvement, and the presumed competitive advantage that school might gain from having the professionalized player on their roster. If either circumstance is borderline, a school can, for example, recommend self-imposed conditions for reinstatement to persuade the NCAA decision-makers to rule in their favor. (Tr. 658-659.) *Page 14 
Given that O'Brien did not give up recruiting Radojevic, even after learning about the professional contract, he was apparently counting on Radojevic's reinstatement, which is evidenced by the fact that, shortly after learning about the contract, OSU accepted what is known as aNational Letter of Intent ("NLI")[6] from Radojevic, on November 11, 1998. (Tr. 604, 649-650.) The significance of the NLI is two-fold: it represents Radojevic's commitment to OSU, to enroll there as a student-athlete and play basketball, and also represents OSU's commitment to provide Radojevic with one of its coveted basketball scholarships. (Tr. 357-358.)
 {¶ 23} In December 1998, Radojevic came back to OSU for anofficial visit[7] (Tr. 305, 652-654.) He spent two days on the campus, attended a basketball game, and was chaperoned to several other school-sponsored events by fellow Serb, Boban Savovic. After this visit, an individual associated with the Radojevic family contacted one of O'Brien's staff soliciting financial assistance from O'Brien, purportedly for Radojevic's mother back in Yugoslavia. (Tr. 125-126.) O'Brien testified that he considered the request, weighing the fact of Radojevic's father having recently passed, and also what O'Brien had come to know about what life must have been like for the Radojevic family, amidst the bombings and ongoing military violence. O'Brien also considered whether any *Page 15 
NCAA rule prevented him from offering help to the family of an athlete who was, in all likelihood, ineligible to play collegiate sports on account that he had already played professional basketball in Yugoslavia. (Tr. 112.)[8] O'Brien resolved that Radojevic was already a professional, and would most likely never play for OSU, which meant that no NCAA rule could control whether it was permissible for him to offer financial assistance to the Radojevic family in their time of need. Thereafter, O'Brien gave then-assistant coach Paul Biancardi an unmarked envelope containing $6,000, instructing Biancardi to take the envelope to New York City and deliver it to a waiter known as Spomenko "Semi" Patrovic. (Tr. 130.) There was speculation as to what specific role Patrovic played in soliciting the loan, and how he was related to or affiliated with the Radojevic family. Although it was not foreseen at that time, Semi Patrovic ultimately became Radojevic's sports agent.
 {¶ 24} There were differing accounts as to precisely when the loan occurred; in fact, the trial court referred to the details as "sketchy." (Liability, 2006-Ohio-1104, at ¶ 9.) O'Brien testified that part of his consideration of whether to make the loan was that he received the request around Christmas time, which supports his position that he made the loan in late December 1998 or early January 1999. (Tr. 128-129.) The NCAA Committee on Infractions, however, questioned O'Brien's recollection of the timing of the loan, and issued a report alleging that the terms of the loan could have been contemplated much *Page 16 
earlier, vis-à-vis September 1998, during O'Brien's recruiting stop in Kansas.[9] The infractions committee's report was not issued until almost a year after O'Brien was fired, thus, it had no bearing on OSU's decision to terminate him. Regardless, the trial court found the NCAA report and its related testimony and evidence to be unreliable; moreover, the trial court correctly held that the report was not binding in these legal proceedings. Ultimately, the trial court found the testimony of former NCAA Committee on Infractions Chair Dr. David Swank more persuasive and credible as to the NCAA's bylaws and procedures:
 In the court's opinion, Professor Swank's view represents a more practical application of the rules. * * *
 Ultimately, the determination whether [O'Brien] committed a major infraction of NCAA rules and what sanctions, if any, may be imposed upon [OSU] will be made by the NCAA Committee on Infractions and not this court.
(Liability, 2006-Ohio-1104, at ¶ 84-85.)
 {¶ 25} Indeed, Dr. Swank's credentials as an expert witness for O'Brien were impressive. After finishing law school at the University of Oklahoma, Dr. Swank worked in private practice in his hometown of Stillwater, Oklahoma, and shortly thereafter became an assistant prosecutor, followed by his election as county prosecutor. (Tr. 327-328.) He resigned his term as prosecutor to return to his alma mater as chief counsel for the university, and assistant professor of law. He later became chief compliance officer there, *Page 17 
and at the same time was appointed and served seven years as an NCAA vice president. (Tr. 328-329.) Dr. Swank later became Dean of the University of Oklahoma College of Law, after which he became the university's president. (Tr. 335-336.) Dr. Swank served as president until 1990, when he joined the NCAA Committee on Infractions. Two years later, Dr. Swank was named chair of that committee, where he served seven more years, and was the chair of that committee at the time of the Radojevic loan. (Tr. 338-339.)
 {¶ 26} Dr. Swank testified as an expert on NCAA bylaws and investigations on behalf of O'Brien, to provide an expert analysis of NCAA rules as applied to the Radojevic family loan, and whether that conduct constituted a major rules infraction thereof. (Tr. 326.) Further, Dr. Swank gave expert testimony relating to the four-year statute of limitations, and whether the limitation period precluded NCAA sanctions as a result of O'Brien's conduct. Id., quoting NCAA Bylaw 32.6.3. Given the 40-year body of work representing Dr. Swank's experience, and the specificity of his expertise relative to the issue upon which he was called to opine, the trial court found Dr. Swank's testimony extremely credible and reliable. Thus, Dr. Swank's testimony was monumentally persuasive, and crucial to determining whether O'Brien materially breached his employment agreement.
 {¶ 27} The trial court adopted O'Brien's version of the timing of the loan, in part, because the court found O'Brien to be a credible witness, but, also, because there was no evidence to support the contrary viewpoint. The only evidence supporting the contrary viewpoint was a document authored by Assistant Director of Enforcement for the NCAA, *Page 18 
Steve Duffin, which was prepared using Duffin's personal notes of his purported interview of Radojevic in November 2004. (Liability,2006-Ohio-1104, at ¶ 29-32.) The trial court deemed Duffin's deposition and its related documents inadmissible because they all contained statements made out of court, which were offered for their purported truth, and that no exception to the hearsay rule was applicable:
 Upon review of the depositions, the court finds that the testimony is riddled with inadmissible hearsay and lay opinions. Moreover, even if the statements attributed to Radojevic could somehow qualify [as] an exception to the hearsay rule, the statements simply lack credibility. The interview was not recorded by stenographic or other means[,] and Radojevic was not under oath * * * In addition, the statements are contained in documents prepared by NCAA enforcement personnel who have taken a position adverse to [O'Brien] in the underlying NCAA proceedings. Finally, even [Andy Geiger] defendant's own athletic director testified that Radojevic lied to the NCAA reinstatement committee in connection with those proceedings.
Id. at ¶ 31. (Emphasis added.) We note, especially, that the trial court did not exclude this evidence solely on account of a technicality (a rule of evidence). To the contrary, the trial court thoroughly examined the evidence prior to making the determination that its truthfulness simply could not be verified, corroborated, or relied upon.
 {¶ 28} O'Brien consistently maintains that the $6,000 was a loan, nothing more, and that he was compelled to offer assistance out of sympathy toward Radojevic's mother. (Tr. 108-109, 126-130.) In short, O'Brien made the loan because he could — he had the money, could spare the money, and it was to go to a good cause. (Tr. 128-130.) O'Brien specifically refuted the idea that he might have made the loan to influence *Page 19 
Radojevic's decision to attend OSU. Id. Accepting the trial court's finding as to the timing of the loan, the court could reasonably find that O'Brien was being truthful in this regard, because, based on the NLI's date of November 11, 1998, Radojevic had already made a final decision to come to OSU. The only possible opposing viewpoint is the one asserted by Steve Duffin: The evidence at trial did not support Mr. Duffin's view.
 {¶ 29} O'Brien's credibility as a witness was also bolstered by evidence that his generosity in this situation was no anomaly. O'Brien testified to making loans to others close to him, including former players, friends, and assistant coaches. These other loans ranged in amounts from $3,500 to $10,000. (Tr. 131-132.) Geiger's testimony was consistent with O'Brien's, to the extent that Geiger believed O'Brien's intentions surrounding the loan to have been pure and humanitarian and that O'Brien had done a "noble act." (Liability, 2006-Ohio-1104, at ¶ 19.)
 {¶ 30} The NCAA requires each member institution to file annual affidavits, which certify that the school, its teams, student-athletes, etc., have complied with all applicable NCAA regulations for that year ("compliance certification"). As a head coach of a major sport, O'Brien was the chief compliance officer for the men's basketball program at OSU. One of O'Brien's primary duties as chief compliance officer was to file the annual compliance certifications for the men's basketball program. At trial, OSU argued that O'Brien's failure to report the Radojevic loan on the compliance certification(s) was deceitful, and that O'Brien's deceit constituted a material breach independent of whether the loan itself was a violation of NCAA rules. The strength of that argument, however, *Page 20 
turned on O'Brien's subjective belief of whether he thought the loan could be a violation. Thus, a key determination in the trial court was whether O'Brien could have reasonably believed that the loan did not constitute an NCAA compliance infraction. (Liability, 2006-Ohio-1104, at ¶ 54.)
 {¶ 31} O'Brien testified that, because Radojevic had professionalized himself in 1996, he could not have violated NCAA recruiting rules when he made the loan in 1998. (Tr. 112, 124-125.) He also maintained that there was no NCAA rule against loaning money to the family of a professional athlete. Dr. Swank concurred, and opined: "because [Radojevic] was not a prospective student-athlete at that time, that it was not a violation of NCAA rules." (Tr. 367.) To arrive at this conclusion, Dr. Swank explained NCAA Bylaw 12.1.1, which sets forth six independent circumstances under which an amateur athlete loses eligibility to participate in NCAA-sanctioned collegiate sports.[10]
Dr. Swank explained that, out of the six disqualifying factors enumerated in Bylaw 12.1.1, in 1996, Radojevic performed five separate and distinct acts, any one of which sufficiently stripped him of amateur status, and that all these events occurred two years prior to the loan. Id. In Dr. Swank's expert opinion, the evidence that Radojevic had become a professional athlete in 1996 was unequivocal, which supported his conclusion that it was reasonable for O'Brien to believe he could make a loan to the Radojevic family without violating NCAA rules. (Tr. 367-372.) *Page 21 
 {¶ 32} Dr. Swank could not render an opinion as to why OSU would continue to recruit a player, and offer that player a scholarship, after learning that the player had played professionally, or was otherwise ineligible to participate in NCAA-sanctioned activities. The only explanation O'Brien offered for why he continued to recruit Radojevic was that he was planning on reinstatement. Subsequently, O'Brien made the loan. He explained that, if Radojevic had been reinstated, he would have had to disclose the loan, because he would have then offered financial assistance to the family of a prospective student-athlete. Dr. Swank did not consider whether Radojevic could have or should have been reinstated, because, in his opinion, reinstatement was not even possible, much less plausible. Although Dr. Swank's position lends more credibility to O'Brien's justification of the loan, it leaves the door open to questions about why O'Brien pursued Radojevic's reinstatement so vigorously with the NCAA.
 {¶ 33} Although O'Brien probably learned about Radojevic's professional contract in September 1998, it was not commonly known within OSU until February 1999, which is when Geiger confronted O'Brien with the news. O'Brien and his staff assured Geiger that Radojevic's contract was essentially propaganda by the Yugoslav government, "a bunch of hooey," and that Radojevic could still be reinstated. (Tr. 306, 308-309.) As part of the reinstatement procedure, OSU formally announced Radojevic's ineligibility and, on March 24, 1999, filed its petition for Radojevic's reinstatement with the NCAA. (Tr. 306-309, 658-669.) The NCAA denied the application, and OSU appealed. (Tr. 672.) The NCAA affirmed its decision on May 24, 1999 — Radojevic had professionalized himself by *Page 22 
signing a professional basketball contract in 1996, and would never play basketball at OSU, or any other NCAA institution for that matter. Geiger testified that, upon learning about the committee's final decision, O'Brien appeared deeply frustrated and disappointed, as if to say that O'Brien was expecting a different outcome. At trial, Geiger did not attempt to reconcile his recollection of O'Brien's reaction in May 1999, with O'Brien's story that he basically knew Radojevic was a professional all along.
 {¶ 34} Radojevic never enrolled at OSU. Shortly after the appeal was decided, Radojevic declared himself eligible for the 1999 NBA draft. He was selected in the first round, as the twelfth overall pick by the Toronto Raptors. OSU closed out its basketball season in March 1999, winning the Big Ten conference title, and going to the Final Four in the NCAA basketball tournament. OSU did not dwell on having missed out on a promising recruit, because almost immediately after the season came to a close, Geiger began talks with O'Brien about the new contract they were about to sign. Other than O'Brien, and probably Paul Biancardi, no one at OSU knew anything about the Radojevic family loan until five years later.
 {¶ 35} In 2003, O'Brien learned about a lawsuit, filed locally, involving an OSU athletics booster, Kathy Salyers, and then former player Boban Savovic.[11] O'Brien *Page 23 
related news about the lawsuit to Geiger because of the likelihood that sensitive information could become a matter of public record. Salyers was deposed around April 2, 2004, and O'Brien either knew, or at least suspected, that the subject matter of Salyers' deposition included information relating to Radojevic. O'Brien knew that, even though Radojevic never attended OSU and never played Division-I basketball, if the loan were discovered by local media it would become headline news, which is why he felt compelled to tell Geiger. (Tr. 110-112.) O'Brien wanted to be sure Geiger found out from him personally, rather than learn about it from the press.
 {¶ 36} On April 24, 2004, O'Brien approached Geiger at the Huntington Club inside Ohio Stadium. They were both attending a donor reception on the day of the football team's annual "Scarlet Gray" spring game. O'Brien told Geiger about the loan, briefly explaining the circumstances, why he had not disclosed it until then, and the reason for finally coming forward, to which Geiger responded that they would "work through it together." (Tr. 109, 224.)
 {¶ 37} Despite that, O'Brien believed the loan did not violate NCAA rules. Geiger and the attorneys in the OSU compliance office[12]
disagreed. (Tr. 112, 144, 223-227, *Page 24 
315.) Together, Geiger and his compliance staff attorneys determined that the loan should be self-reported to the NCAA, and did so the following month. (Tr. 229, 256.) Shortly thereafter, O'Brien met with Geiger and Julie Vannatta, one of the compliance office staff attorneys on May 26, 2004, to discuss the joint investigation of OSU and the NCAA, which was soon to ensue. During that meeting, Geiger advised O'Brien that O'Brien should retain independent counsel. (Tr. 241.)
 {¶ 38} The following day, O'Brien called Geiger to ask if he was going to be fired. O'Brien testified that Geiger had replied "no," however, Geiger could not confirm his reply. On cross-examination, when O'Brien's counsel asked Geiger whether he had told O'Brien he was not going to be fired, Geiger stated, "It's possible." (Tr. 243.) Geiger contacted O'Brien a few days later to find out if he had retained counsel, and also asked whether O'Brien intended to resign. O'Brien told Geiger that he had retained attorney James Zestzutec, but they did not fully resolve the issue of O'Brien's resignation. O'Brien's attorney then sent a letter to Geiger, stating his client's intent and willingness to cooperate with the athletics department and the NCAA during the impending investigation. (Tr. 510-512.) Geiger did not respond to the letter, nor did Geiger or any of his staff meet with O'Brien's attorney before terminating him on June 8, 2004. *Page 25 
 {¶ 39} At approximately 7:30 a.m., on June 8, 2004, Geiger called O'Brien at his home, and asked O'Brien to meet him at his office as soon as possible. (Tr. 211-213.) O'Brien arrived at Geiger's office within the hour, and, after waiting awhile, Geiger handed him a letter of termination. (Termination Letter from Geiger to O'Brien dated June 8, 2004, hereafter "termination letter.") Geiger told O'Brien that he had the option of resigning in lieu of termination, but that he had already scheduled an afternoon press conference to make the announcement, one way or the other.
 {¶ 40} In the hours that followed, O'Brien's attorney tried contacting Geiger and OSU to request a meeting, or to be given more time for O'Brien to consider his options. (Tr. 511-512.) Although Julie Vannatta spoke briefly with O'Brien's attorney that day, she declined counsel's requests to meet, or for an extension of time. Id. Geiger announced the coach's firing as planned, at the afternoon press conference.
 III. {¶ 41} Nearly one year after O'Brien was fired, the NCAA issued a "notice of allegations"[13] to OSU alleging major rules infractions by the men and women's basketball programs, and also the football program. Six of the alleged violations concerned former basketball player Boban Sovovic, and three of them related to Radojevic.
 {¶ 42} Before and during trial, the trial court ruled in favor of OSU on several motions in limine, and routinely sustained OSU's objections to O'Brien's counsel making *Page 26 
any reference to persons, facts, or events other than those specific to the Radojevic loan. (Tr. 8-51.) As a product of these rulings, the record is virtually silent to the circumstances surrounding the majority of the violations alleged in the notice issued March 13, 2005. Additionally, the trial was held in December 2005, while the NCAA did not conclude its investigation until March 10, 2006. Thus, at the time of trial, it was unknown (1) whether the loan to Radojevic constituted an infraction of NCAA rules; (2) if the loan was an infraction, whether the infraction was major, or only secondary; and (3) whether and to what extent OSU could be punished as a result of the Radojevic loan. For a number of reasons, these undetermined facts were problematic to litigation of the claims herein.
 {¶ 43} Counsel for both parties have submitted motions to supplement the trial court record, and/or to urge this court to take judicial notice of certain facts not in evidence. We previously determined that the record was sufficient to review the judgment of the trial court, and overruled all motions to supplement. Consequently, we will not review or give consideration to the subsequent determinations made by the NCAA with regards to (1) whether O'Brien's conduct constituted a major or secondary rules' infraction, or (2) to what extent OSU has been harmed as a direct or proximate result thereof. After thoroughly examining all the evidence in this case, the trial court made specific findings relating to both of these issues, which, provided they are supported by *Page 27 
some competent, credible evidence, obviate the need to supplement the record. Further, this court is not bound by the determination of the NCAA.
 IV. {¶ 44} O'Brien brought a single claim against OSU, alleging that OSU breached his employment contract when it fired him on June 8, 2004. A contract is (1) an agreement, (2) with consideration (i.e., quid pro quo), (3) between two or more parties, and (4) to do or not to do a particular thing. Powell v. Grant Med. Ctr. (2002), 148 Ohio App.3d 1,10, at ¶ 27, quoting Lawler v. Burt (1857), 7 Ohio St. 340, 350. Under Ohio law, to prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of, and terms of, a contract; (2) performance by the plaintiff; (3) non-performance by the defendant; and (4) damages caused by defendant's breach. Powell, ibid.; Roth Produce Co. v.Scartz (Dec. 27, 2001), Franklin App. No. 01AP-480; Doner v. Snapp
(1994), 98 Ohio App.3d 597, 600.
 {¶ 45} There is no dispute, here, as to the existence of a contract. (Liability, 2006-Ohio-1104, at ¶ 34.) O'Brien's claim turned on demonstrating, by a preponderance of the evidence, that (1) he substantially performed under the contract, and (2) OSU breached the contract by terminating him.
 {¶ 46} The doctrine of substantial performance provides that, where a contract requires numerous performances by one or more of its parties, a party's breach of a single term thereof does not discharge the non-breaching party's obligations under the remainder of the contractunless performance of that single term is essential to the *Page 28 
 purpose of the agreement. Kersh, at 62, citing Boehl v. Maidens
(1956), 102 Ohio App. 211. Stated another way, default by a party who has substantially performed does not relieve the other party from subsequent performance. See Hansel v. Creative Concrete MasonryConstr. Co. (2002), 148 Ohio App.3d 53, 56-57; Kersh, citing Hadden v.Consol. Edison Co. of New York, Inc. (1974), 34 N.Y.2d 88; cf. 6 Williston on Contracts (3rd Ed. 1962) 165, Section 842; Restatement of Law 2d, Contracts (1981) 237, Section 241.
 {¶ 47} OSU terminated O'Brien's contract prior to its term. The crux of OSU's argument is that, on account of the loan to Radojevic in 1998 (and subsequent failure to disclose), O'Brien did not substantially perform under the contract, which excused OSU from all future performances. Stated more simply, OSU asserts that it was justified in terminating O'Brien under the terms of his written contract.
 {¶ 48} Several key witnesses, including OSU's athletics director, Geiger, testified that O'Brien had done a fine job as head men's basketball coach, which was evidenced demonstratively by the team's winning record, and O'Brien's numerous national coaching awards. (Tr. 200-201, 787.) Notwithstanding, OSU argued that the loan was such an egregious violation of NCAA rules that it constituted a material breach within the meaning of Section 5.1(a) of the contract, and that, because of that material breach, OSU was justified in its action terminating O'Brien's employment.
 {¶ 49} In its first assignment of error, OSU asserts that the trial court erred by finding that the Radojevic loan did not materially breach O'Brien's contract. They contend — notwithstanding Section 5.1, which explicitly provides the circumstances under *Page 29 
which O'Brien could be fired "for cause" — that the Radojevic loan also violated Section 4.1(d), requiring O'Brien to "run a clean and compliant program." (Tr. 518.) In Geiger's termination letter to O'Brien, Geiger justified the decision to terminate him as follows:
 In our discussion on April 24, 2004, you admitted that you knew your action was a violation of NCAA rules, and you are correct. In particular, it is a recruiting inducement in violation of NCAA Bylaw 13.2.1. Despite the fact that the University was no longer actively recruiting Mr. Radojevic * * * Furthermore, for each of the past five years, you violated NCAA Bylaw 30.3.5 which, by your signature on the annual NCAA Certification of Compliance form, requires you to confirm that you have self-reported your knowledge of any NCAA violations. We have self-reported this matter and other allegations related to the program to the NCAA.
 Section 4.1(d) * * * requires you to "know, recognize and comply" with all applicable rules and regulations of the NCAA and to "immediately report to the Director [of Athletics] and to the Department of Athletics Compliance Office" if you have "reasonable cause to believe that any person . . . has violated . . . such laws, policies, rules or regulations." You have materially breached this important term of your contract.
 Unfortunately, your admitted wrongdoings leave the University no choice. Pursuant to Section 5.1(a) of your employment agreement, we intend to terminate such agreement for cause, effective at 5:00 p.m. today, June 8, 2004. * * *
(Emphasis sic.)
 {¶ 50} Although Geiger cited to specific NCAA bylaws in the letter, he offered only his own interpretations thereof. Thus, Geiger's assertion was that O'Brien violated what amounted to Geiger's own — or OSU's own — interpretation of the NCAA's rules, and, based on that interpretation, he concluded that O'Brien materially breached his contract. *Page 30 
Accepting that analysis as apposite, Section 5.1(a) provides that OSU could terminate the coach, on the basis that he committed a material breach of the agreement. This was the basis Geiger cited for O'Brien's termination. No other basis for O'Brien's termination was set forth at that time.
 {¶ 51} Section 5.1 of the contract provides that OSU could fire O'Brien for either, or both, of the following:
 (a) a material breach * * *; [or]
 (b) a violation by Coach (or a violation by a men's basketball program staff member about which Coach knew or should have known and did not report to appropriate Ohio State personnel) of applicable law, policy, rule or regulation of the NCAA or the Big Ten Conference which leads to a "major" infraction investigation by the NCAA or the Big Ten Conference and which results in a finding by the NCAA or the Big Ten Conference of lack of institutional control over the men's basketball program or which results in Ohio State being sanctioned by the NCAA or the Big Ten Conference * * * .
When both subsections of 5.1 are read in pari materia, it becomes abundantly clear that subsection (b) provides the circumstances under which OSU could terminate O'Brien for conduct relating to NCAA rules or violations thereof. But OSU did not fire O'Brien under the authority of Section 5.1(b). In fact, there is no mention or reference to Section 5.1(b) in the entire body of the termination letter.
 {¶ 52} Geiger's letter to O'Brien gave the explicit reason(s) for his termination as: (1) violation of NCAA Bylaw 13.2.1; and (2) violation of NCAA Bylaw 30.3.5, which, together, constituted a material breach of the contract — cause for termination under *Page 31 
Section 5.1(a). However, this reasoning is suspect on account of subsection (b), for two reasons: First, it violates basic principles of contract interpretation, by rendering subsection (b) useless. Contracts must be interpreted in a way that gives meaning to each term. State exrel. Gordon v. Taylor (1948), 149 Ohio St. 427, 437; Osborne v. HartfordLife and Accident Ins. Co. (C.A.6, 2006), 465 F.3d 296. Secondly, its reasoning creates a "bootstrapping" effect by allowing OSU to substitute its own judgment for that of the NCAA. Doing so expressly violates the agreed-upon terms in Section 5.1(b), which require an NCAA determination (and sanctions resulting therefrom) of whether the coach committed a violation.
 {¶ 53} The parties to the contract at issue — i.e., the coach and OSU — negotiated the terms and circumstances under which OSU could terminate the contract prior to its term. The parties agreed that OSU could not fire O'Brien unless a specific condition occurred and, as of June 8, 2004, that condition had not occurred. In fact, the evidence does not conclusively show that that condition has occurred to date. Thus, we cannot say whether O'Brien could have been terminated pursuant to the NCAA's determination in 2006; however, even if it would have been proper to terminate him at that time, much of the liquidated damages awarded to O'Brien in the judgment of the trial court would have been earned as salary.
 {¶ 54} Job security is not the first item on the lists of most high-profile coach's perks of employment, and when Geiger came to O'Brien in 1999 to renegotiate his contract, O'Brien bargained to have a contract that provided more certainty in that regard. *Page 32 
O'Brien knew in 1999 that NCAA investigations happen all the time — or, in the words of OSU's Law Professor and Vice President of Student Affairs, David Williams: It's just the nature of the beast. O'Brien wanted to insulate himself from some of the uncertainty that goes with being a high-profile coach in Division-I college sports, which is why he sought the guarantee from OSU that he would not be fired prematurely, at the outset of a rumor, or speculation that, in the future, the NCAA might impose some sanction against OSU for some reason. OSU agreed with this term, and reduced it to writing. In doing so, OSU bargained away its unfettered discretion to terminate O'Brien, especially as it related to any conduct or subject matter arising in the context of NCAA rules.
 {¶ 55} Even if, however, OSU had not bargained away this right — its own discretion or self-determination of what constitutes an NCAA major infraction — this court cannot say that independently of being an alleged NCAA recruiting violation, O'Brien materially breached his contract with OSU by loaning $6,000 to the family of a player who was never eligible to play college basketball in the first place.
 {¶ 56} At common law, a "material breach" of contract is a party's failure to perform an element of the contract that is "so fundamental to the contract" that the single failure to perform "defeats the essential purpose of the contract or makes it impossible for the other party to perform." 23 Williston on Contracts, Section 63:3. As applied to the facts here, based on our review of the contract itself, and the relevant testimony, we agree with the trial court's determination that NCAA compliance was but one of O'Brien's many duties. (Liability,2006-Ohio-1104, at ¶ 38.) That said, failure to strictly comply with NCAA rules *Page 33 
does not entirely frustrate the purpose of the contract, unless it were true that every time a coach or player within the NCAA's jurisdiction commits a violation of its rules, that athlete or coach (or the member school) is barred from competition. In other words, at common law, the Radojevic loan could have constituted a material breach if the NCAA had determined that the loan was a major infraction warranting a lengthy suspension from NCAA competition. For the purposes of this inquiry, however, the common law material-breach analysis is circuitous, because it cannot be determined independent of the NCAA's findings. Again, OSU did not wait for the NCAA to make such a determination, and, essentially, OSU substituted its own judgment for that of the NCAA to make its own determination, which tends to controvert the very heart of the parties' agreement vis-À-vis Section 5.1(b).
 {¶ 57} Amici argue on behalf of OSU that the above interpretation of Section 5.1(b) "undermines the institution's ability to self-monitor its programs, and to speedily put an end to any improper circumstances, self-report and self-sanction in an effective manner." (Amici Curiae brief, at 20.) Although amici do not cite to any case or authority for this proposition, we find it a persuasive one indeed. However, amici's policy argument, regardless of how logical or persuasive, fails to take the actual agreement between O'Brien and OSU into account. The specific problem we face is that, on these facts, in Section 5.1(b) of the contract, the parties specifically contemplated the consequences that would follow if an NCAA violation was alleged or believed to have occurred. Those consequences did not include termination of the contract prior to an NCAA determination. *Page 34 
Thus, under the terms in Section 5.1(b), OSU acted prematurely by firing O'Brien on June 8, 2004.
 {¶ 58} In turn, at oral argument, OSU attempted to circumvent the meaning of Section 5.1(b) by asserting that O'Brien's conduct (i.e., the loan, and failure to disclose) had significance independent of whether the conduct was a violation of NCAA rules. We cannot agree. If the NCAA did not prohibit a school's providing a cash incentive to prospective student-athletes, it does not seem logical that O'Brien's conduct would have been objectionable.
 {¶ 59} The act of giving money to an athlete or prospective athlete is a common practice outside of the NCAA — professional franchises offer multi-million dollar signing bonuses to prospective athletes all the time, to encourage them to sign a contract with that respective team. Therefore, OSU's argument in that regard is unpersuasive, and we must determine whether O'Brien's conduct constituted a material breach within the meaning of the contract.
 {¶ 60} Restatement of the Law 2d, Contracts, sets forth a more precise analysis for determining whether a party's breach of a contract was material, by using a five-prong test, which this court adopted inKersh, at 62-63 (citing Restatement of the Law 2d, Section 241; see, also, Klaus, at 730-731; Shanker v. Cols. Warehouse Ltd.,Partnership (June 6, 2000), Franklin App. No. 99AP-772. The Restatement test is prevailing law, and it was used by the Ohio Court of Claims in deciding this case: *Page 35 
 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
 (c) the extent to which the party failing to perform * * * will suffer forfeiture;
 (d) the likelihood that the party failing to perform * * * will cure his failure, taking account of all the circumstances including any reasonable [adequate] assurances;
 (e) the extent to which the behavior of the party failing to perform * * * comports with standards of good faith and fair dealing.
(Liability, 2006-Ohio-1104, at ¶ 100-104.)
 {¶ 61} Under the first prong, Restatement of the Law, Section 241(a), OSU argues that the Radojevic loan deprived OSU of the benefit it reasonably expected from O'Brien's contract, because O'Brien's conduct: (1) subjected OSU to NCAA sanctions; (2) adversely affected OSU's reputation; and (3) breached the trust between O'Brien and Geiger, the athletics director. The trial court made factual findings with regard to each of the three injuries claimed by OSU, and ultimately determined that, in and of itself, the Radojevic loan did not substantially harm OSU. We accept the trial court's findings provided they are supported bysome competent, credible evidence. CE. Morris Co.; Columbus HomesLtd., supra.
 {¶ 62} As a preliminary matter, we note that "breach of trust" was not mentioned in the termination letter and, although there is an implied duty of good faith in every contract, *Page 36 
trust was not specifically mentioned in the parties' agreement, nor was "breach of trust" cited as possible grounds for cause to terminate the contract.
 {¶ 63} OSU's first claimed injury was NCAA sanctions. The trial court found that, because the NCAA's allegations related to matter(s) other than the Radojevic loan, the extent of harm caused to OSU "that can befairly attributed to the Radojevic matter is difficult to predict." (Liability, 2006-Ohio-1104, at ¶ 110.) (Emphasis added.) Geiger and Julie Vannatta even acknowledged that the Radojevic matter was barred by the four-year limitation period in NCAA Bylaw 32.6.3. (Tr. 250, 526.) Thus, because the loan occurred in 1998 (or, at the latest, January 1999), the statute of limitations had already expired when OSU reported the matter to the NCAA on May 18, 2004. Dr. Swank concurred. (Tr. 368-369.) Further, the trial court made a specific finding that the NCAA did not seek any sanctions arising out of O'Brien's failure to report the loan on the annual compliance forms.
 {¶ 64} The only sanctions suffered by OSU were self-imposed, with hopes the NCAA would view the institution's self-determined punishment as reasonable, and decline to impose further sanctions. (Miechelle Willis Depo., Aug. 18, 2005, at 101-102.) OSU argued that it was substantially injured by the self-imposed sanctions, which included a ban from post-season and NCAA tournament play for the 2004-2005 season, and relinquishing two basketball scholarships from the 2005 recruiting class. Contrary to OSU's argument, however, the trial court found these sanctions to be insubstantial. Geiger announced the one-year post-season ban in December 2004, and it appears from *Page 37 
the timing of that announcement that Geiger made the decision based on the fact that the team was unlikely to be invited to a post-season tournament in the first place. Despite the fact that the 2004-2005 team finished by upsetting the nation's top-ranked team, prior to that game, the Buckeyes had played rather poorly throughout the year. Thus, the likelihood that OSU would have been invited to the 2005 NCAA tournament was slim, at best, and the post-season ban was illusory. As to the relinquished scholarships, the trial court found that the 2005 recruiting class was one of the best ever.
 {¶ 65} The second alleged harm was harm to OSU's reputation. The trial court found that any reputational harm was similarly exaggerated, at least as it specifically related to the Radojevic matter. Radojevic never enrolled at OSU, "and never played a single second for [OSU]'s basketball team." (Liability, 2006-Ohio-1104, at ¶ 124.) The matter involving Boban Savovic, conversely, was much more damaging to OSU's reputation, because Savovic was enrolled as a student-athlete at OSU for four years.
 {¶ 66} NCAA investigations are not uncommon at Division-I institutions, such as OSU. The fact of the matter is, NCAA violations happen all the time, "[it's] the nature of the beast." (Williams Depo., at 52.) Also relevant to the issue of OSU's allegedly-damaged reputation is the fact that almost immediately after firing O'Brien, OSU was able to lure one of the nation's top coaching prospects to assume O'Brien's former position. (Thad Matta Depo., Aug. 25, 2005, at 5-8.) Shortly thereafter, Matta successfully recruited possibly the best recruiting class ever. Based on this evidence, the trial court could reasonably find the Radojevic loan did not cause serious harm to OSU. *Page 38 
 {¶ 67} As noted earlier, the parties did not mention trust in the agreement, and OSU did not cite to such a proposition until after this litigation ensued. Regardless of whether OSU "manufactured" the trust issue for the purposes of litigation, the issue should not be ignored altogether. The trial court found the breach-of-trust issue as most probative of a material breach. (Liability, 2006-Ohio-1104, at ¶ 135.)
 {¶ 68} The trial court also concluded, however, trust was not contemplated in the written employment agreement as a requirement. "At best, the issue of trust is an implied term of the parties' agreement." Id. at ¶ 141. Because OSU did not place enough value on the parties' trust to incorporate it into the words of the contract, O'Brien's alleged failure to provide or perform this element cannot give rise to a material breach.
 {¶ 69} When weighing Geiger's testimony concerning his relationship and friendship with O'Brien, the trial court found that O'Brien's conduct put a strain on the parties' relationship. However, the trial court found this mistake was not a fatal error, and "was not as profound and debilitating" as OSU contended. Id. Based on our thorough examination of Geiger's testimony, it appears that Geiger and O'Brien were, at one time, very close. Given their close and meaningful friendship, it was reasonable for Geiger to at least engage O'Brien in discussions about O'Brien's future after the Radojevic loan was revealed.
 {¶ 70} The testimony of OSU President Karen Holbrook, and athletics department compliance attorneys Julie Vannatta and Heather Lyke confirm the fact that O'Brien was not given an opportunity to cure his mistake. Vannatta testified emphatically that some *Page 39 
infractions are just so egregious that they cannot be cured. Vannatta's statement was hyperbolic, given the actual injury OSU suffered as a direct result of O'Brien's conduct. The trial court ultimately found the Radojevic loan was not nearly as egregious as OSU contends. And based on our review, that finding is supported by competent, credible evidence.
 {¶ 71} The second prong of the test, Restatement of the Law, Section 241(b), looks to whether the plaintiff can compensate the defendant for failing to perform under the contract. The trial court correctly found this determination troubling, because OSU's injury was "largely non-economic." (Liability, 2006-Ohio-1104, at ¶ 142.) Logically, because OSU's injuries were mostly non-economic, it was not possible to fully compensate them. Although this factor weighs in favor of OSU, the fact that the actual injuries attributed to O'Brien's conduct were insubstantial de-emphasizes the need to be fully compensated.
 {¶ 72} Restatement of the Law, Section 241(c) requires the court to examine the extent to which the breaching party will suffer forfeiture if the defendant's non-performance is excused. Here, based on the liquidated damages formulae in Sections 5.2 and 5.3, and the fact that O'Brien had roughly three years remaining on his contract, excusing OSU from all future performance would impose a substantial hardship on O'Brien, because he would forfeit millions of dollars in guaranteed salary.
 {¶ 73} OSU has persistently argued that O'Brien's failure under the contract could not be cured. The trial court determined that, because of the non-economic nature of *Page 40 
OSU's injuries, "there is no meaningful cure with respect to those sanctions." (Liability, 2006-Ohio-1104, at ¶ 144.) Further, to the extent the court of public opinion formed any negative perceptions about OSU based on the Radojevic matter, that injury, also, could not be negated.
 {¶ 74} As we stated above, the parties' good faith is implied in every contract, and the Restatement specifically incorporates it into the final prong of the test. Restatement of the Law, Section 241(e). OSU argues that O'Brien acted in bad faith by covering up his misconduct for several years. In the words of OSU's counsel at oral argument: "If lyingto your employer for four years is not a material breach, it's hard toimagine what would be!" Although the premise for counsel's argument is sound, it is unsound in application because it assumes facts not in evidence. Counsel for OSU assumes for the purposes of the argument that, between December 1998 and April 24, 2004, O'Brien systematically either denied allegations about the Radojevic loan, or took affirmative steps to conceal it from OSU. The evidence does not support such a conclusion. After O'Brien made the loan in 1998, and Radojevic was drafted by the NBA in the spring of 1999, there is not a single inference that can be drawn from the record to suggest that O'Brien even thought about the loan from the time it occurred until he learned about Kathy Salyers' lawsuit. Again, in O'Brien's own mind, he did not believe he had done anything wrong, thus, he would not have had a motive to conceal what he had done. In his mind, he came forward to Geiger on April 24, 2004, as a matter of courtesy. The fact that he came forward, of itself, was not an admission of guilt. *Page 41 
 {¶ 75} As to a good-faith analysis, under Restatement of the Law, Section 241(e), it appears from the record that O'Brien demonstrated good faith on more than one occasion subsequent to April 24, 2004. He stayed in contact with Geiger, complied with each of Geiger's requests, continued to do his job, and he offered to fully cooperate with the impending NCAA investigation. OSU on the other hand, did not reciprocate O'Brien's good-faith efforts, and, despite Geiger's words on April 24, 2004, neither Geiger nor anyone else from OSU attempted to work anything out with O'Brien.
 {¶ 76} Even the language in Section 5.1(a) — the provision under which O'Brien was purportedly fired — stated that prior to termination for a "material breach," OSU had to put O'Brien on notice that he was in breach, and to give O'Brien an opportunity to cure. OSU made no attempt to comply with this contractual term. OSU drafted the contract, therefore its terms must be resolved in favor of O'Brien. Under the terms of the agreement, OSU should have given O'Brien an opportunity to cure what OSU apparently believed to have been a material breach.
 {¶ 77} It is clear from the record that the underlying nuances to the trial court's findings of fact were heavily influenced by the credibility of the witnesses in the proceedings. O'Brien, himself, was a credible witness because, with one exception, nearly every material fact to which he testified was independently corroborated by another witness. Dr. Swank's testimony was also very influential on the trial court's determination. Indeed, a very brief summary of Dr. Swank's credentials took nearly an entire page of this text above. The trial court found Dr. Swank's expert opinion to be the more credible, *Page 42 
reasonable, and ultimately persuasive opinion as to the issues at bar. The key portions of Dr. Swank's testimony included a well-reasoned opinion that O'Brien's conduct did not constitute a violation, and the fact that the four-year limitation period ultimately precluded OSU from being sanctioned even if the NCAA did find that a violation occurred. As a law professor, former law school dean, former university president, and perhaps most importantly, as the former Chair of the NCAA Committee on Infractions, Dr. Swank's testimony could not be ignored.
 {¶ 78} In sum, even though in our view Section 5.1(a) did not give OSU the right to terminate the contract pursuant to allegations of an NCAA violation, after examining the material breach factors applied by the trial court, its determination is not against the manifest weight of the evidence.
 {¶ 79} OSU's first assignment of error is overruled.
 {¶ 80} In its second assignment of error, OSU argues that the after-acquired evidence doctrine should have barred O'Brien's claim altogether pursuant to the NCAA's OSU Public Infractions Report issued March 10, 2006. We disagree.
 {¶ 81} The after-acquired evidence doctrine applies to cases where, subsequent to terminating an employee, the employer learns about independent facts or circumstances that were alternatively sufficient grounds for the employee's termination. See McKennon v. Nashville BannerPub. Co. (1995), 513 U.S. 352, 362-363, 115 S.Ct. 879; see, also,San v. Scherer (Feb. 5, 1998), Franklin App. No. 97APE03-317. Typically, this type of situation arises when a former employee brings a Title VII (discriminatory discharge) *Page 43 
action against their former employer. See, ibid. The doctrine serves to limit the employee's damages at trial if the employer can show after-acquired evidence of facts or circumstances unknown at the time of termination, which provide an independent basis for the termination. This doctrine has very limited application. For example, the after-acquired evidence must relate to facts not known at the time the employer terminated the employee. Also, the doctrine does not serve as a complete bar to relief. McKennon, at 360-361.
 {¶ 82} Clearly, the after-acquired evidence doctrine has no application in this case. First of all, OSU does not point to a specific piece of evidence that was later-acquired, which would have been an independent basis for O'Brien's termination. OSU does point to the March 2006 NCAA infractions report, however, the facts therein were already known to OSU prior to terminating O'Brien. Therefore, that report does not satisfy the requirement of the after-evidence doctrine. Furthermore, OSU's argument that the NCAA report is after-acquired evidence is counterintuitive because it tends to suggest that OSU acknowledges the lack of a legal basis for O'Brien's termination on June 8, 2004. Secondly, the after-acquired evidence doctrine does not serve as a complete bar to a former employee's claims.
 {¶ 83} OSU's second assignment of error is overruled.
 v. *Page 44 {¶ 84} In his cross-appeal, O'Brien argues that the trial court miscalculated the damages owed on the contract by failing to include years allegedly added to the contract term as earned incentives, and also by deducting cash incentives paid by OSU from the final judgment ("setoffs"). We disagree.
 {¶ 85} On cross-appeal, O'Brien's first assignment of error asserts that the trial court's calculation of liquidated damages was flawed because it concluded only three years were remaining on the contract at the time O'Brien was fired. O'Brien claims that, under Section 3.4, he earned two additional years by winning Big Ten Conference Championships in 2000 and 2002, which vested simultaneously with the occurrence of events serving as conditions precedent thereto, and that the two additional years should have been aggregated to the three-year base term found by the trial court. Also, in the second assignment of error, O'Brien argues that the trial court erred by reducing the final damages award by $35,609, the amount OSU paid O'Brien in cash incentives during the 2000 and 2002 seasons. Both assignments of error turn on interpretation of the same contractual terms as applied to the same facts and reasonable inferences drawn therefrom; thus, we will address both assignments of error together.
 {¶ 86} The errors claimed on cross-appeal pertain to the trial court's interpretation of the terms providing the conditions and payment of performance incentives under Section 3.4 of the contract. Because contract interpretation is a legal determination, we review the contract de novo. See West v. Household Life Ins. Co., 170 Ohio App.3d 463,2007-Ohio-845, at ¶ 7; McConnell v. Hunt Sports Ent. (1999),132 Ohio App.3d 657, 675. *Page 45 
Where the trial court has made a finding of fact requisite to resolving a particular legal issue therein, we presume the trial court's findings are correct. Wilson; C. E. Morris; Columbus Homes Ltd., supra.
 {¶ 87} At common law, a "setoff" is a defendant's counter-demand against the plaintiff, arising out of a transaction wholly separate or independent of the litigated claim, which the judgment-debtor has a right to apply towards the judgment awarded to the plaintiff. See Black's Law Dictionary 1404 (8th Ed.2004). The judgment or debt is, thus, setoff — reduced by whatever amount the plaintiff previously (or concurrently) owed the defendant. Thomas W. Waterman, A Treatise on the Law of Set-Off, Recoupment, and Counter Claim (2nd ED.1972) 1, Section 1; R.C. 2333.09. Setoff is distinguished from a counterclaim because it is an amount owed that is not in dispute, and is not the subject of the litigation. Setoff is most common in an action where one of the parties is a lending institution; however, it can arise under a variety of contractual circumstances provided there exists a contractual right between two parties where each party owes a finite sum to the other. The parties' respective debts are offset by way of mutual deduction.Walter v. Natl. City Bank of Cleveland (1975), 42 Ohio St.2d 524, 525
(citing Witham v. South Side Bldg. Loan Assn. of Lima [1938],133 Ohio St. 560, 562). For example, courts have held that a bank may setoff a bank account against the matured indebtedness of its depositor, although the bank has been garnished at the instance of a creditor of the depositor. Walter, at 526 (citing Schuler v. Israel [1887],120 U.S. 506, 7 S.Ct. 648). In Bank of Marysville v. Windisch-Muhlhauser BrewingCo. (1893), 50 Ohio St. 151, the *Page 46 
Ohio Supreme Court held that a bank could setoff the amount of an insolvent depositor's checking account against the depositor's unpaid and overdue note. Furthermore, the lender could take action without the knowledge or consent of the depositor, and the bank could refuse payment of future checks drawn on the insolvent account. Id.; Walter, supra, at 526-527.
 {¶ 88} In this case, during the damages phase of the litigation, both parties stipulated that OSU paid O'Brien cash incentives totaling $35,609. (Final Entry, 2006-Ohio-4737, at ¶ 9.) In accordance with Section 3.4 of O'Brien's employment agreement, on April 30, 2000, OSU paid O'Brien $17,500 in recognition of the men's basketball team's achievement of co-champion of the Big Ten Conference, and on March 31, 2002, OSU paid O'Brien $18,109 in recognition of the team's outright Big Ten Championship. Id. The trial court found, however, that the events triggering the incentives to become payable to O'Brien did not actually occur; thus, that OSU overpaid O'Brien. Id. at ¶ 11.
 {¶ 89} Section 3.4 of O'Brien's contract stated the following:
 Coach shall also receive the following sums within sixty (60) days of the achievement, as supplemental compensation, in consideration of his efforts in contributing to the exceptional achievements listed below:
 * * *
 Awarded title of Big Ten Conference Champions or Co-Champions[:] 10% of then-current base salary plus one (1) additional year added to term of this agreement[.] *Page 47 
 {¶ 90} O'Brien argued to the trial court that, under that contractual provision, and in light of the occurrence(s) of the aforementioned achievements, that there were five years plus 22 days remaining on his contract as of June 8, 2004. (O'Brien's Motion for Summary Judgment on Damages, at 3; Damages, 2006-Ohio-4346, at ¶ 42.) OSU argued, however, that O'Brien did not earn the aforementioned incentives in light of the NCAA's determination vacating the OSU men's basketball team's records from both purported championship years. (OSU's Motion for Summary Judgment on Damages, at 6; Damages, 2006-Ohio-4346, at ¶ 46.) The trial court found that the evidence better supported OSU's argument. This court agrees.
 {¶ 91} In this appeal, O'Brien urges this court to take judicial notice that the NCAA did not vacate OSU's conference championships from the years in question, only that OSU's NCAA tournament records were vacated. Despite counsel's persuasively-briefed arguments to this court, the result desired tends to defy common sense. Counsel's argument, in effect, is a jurisdictional one — that the NCAA and the Big Ten Conference are separate and sovereign entities, and that what the Big Ten giveth, the NCAA cannot taketh away. Although the argument is sound, it lacks evidentiary support.
 {¶ 92} A judicially-noticed fact is that which is not subject to reasonable dispute because either: (1) it is generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination. See Evid.R. 201. Counsel urges this court to take notice of a fact published by the Big Ten Conference itself, in what is known as the official records book, which is available to download from their website *Page 48 http://bigten.cstv.com/trads/big10-recordbook.html. (Cross-Appellant's brief, at 10, fn.3.) The records book lists the number of championships held by each respective school in each respective sport, for all of the schools comprising the Big Ten. See 2006-2007 Big Ten Records Book 24,available at Big Ten Conference Official Site, supra (last visited June 4, 2007). Therein, the OSU men's basketball school record is specially denoted by a footnote, which states: "Due to NCAA sanctions, Ohio Statehas vacated the men's basketball records of 34 games in 1998-99, 16games in `99-00 and the entire `00-01 and `01-02 seasons (including twoshared Big Ten Men's Basketball Championships (2000 and 2002titles)." Id. (Emphasis sic.) We cannot see how this fact, if judicially noticed, supports counsel's argument.
 {¶ 93} That said, we believe the trial court correctly calculated the contract's liquidated damages in accordance with Sections 5.2 and 5.3. The trial court correctly concluded the period remaining on the contract's term, and the trial court correctly deducted amounts OSU paid to O'Brien pursuant to events that never occurred. O'Brien's first and second cross-assignments of error are overruled.
 {¶ 94} The trial court found O'Brien's contract was "extremely favorable" to himself, but "not unreasonable." (Damages, 2006-Ohio-4346, at ¶ 34.) The court's analysis included a proper examination of the contract's terms to determine that all relevant provisions were valid and enforceable, and that no provision was contrary to law or public policy. Further, the trial court found: *Page 49 
 The stipulated damages were clearly reasonable in light of the anticipated salary and collateral income [Coach O'Brien] could have earned had he remained in defendant's employ. * * *
 * * *
 The court recognizes that * * * it may seem unreasonable for a party to recover * * * damages without any reduction arising from his own breach of contract. However * * * it is clear that this seemingly unfair result arises from the extremely favorable provisions of the contract as it relates to [Coach O'Brien] in respect to termination and not from any lack of proportionality with respect to the amount of liquidated damages.
Trial Court Decision, at 13-14.
 {¶ 95} Again, the decision of this court does not ratify or condone the conduct of O'Brien. Under different facts, or even more likely, broader contractual terms not favoring the employee to such a degree, the result here would not be the same. When two parties agree to do a particular thing, and the parties precisely and deliberately contract for every foreseeable circumstance that could arise in the performance thereunder, a court must honor the parties' agreement absent unconscionability. Lake Ridge Acad. v. Carney, (1993),66 Ohio St.3d 376, 381; Westfield Ins. Co. v. HULS Am., Inc. (1998),128 Ohio App.3d 270, 291 (holding that Ohio law allows parties to freely agree upon contractual terms). Unconscionability is typically characterized by absence of one party's "meaningful choice" or opportunity to negotiate the terms of a contract, which invariably results in terms substantially favoring the other party. See, e.g., Eva v. Midwest Natl. Mtge.Bank, Inc. (N.D.Ohio 2001), 143 F.Supp.2d 862, 895 (A "contract is unconscionable if it did not *Page 50 
result from real bargaining between the parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion"). Lake Ridge, at 383. Invariably, an unconscionable contract will have terms favoring the drafting party. There is no evidence to suggest OSU lacked a meaningful choice or opportunity to negotiate the contract with O'Brien; moreover, OSU was the drafting party. OSU is not lacking in sophistication, and has only been prejudiced as a result of being held to its own bargain. OSU entered into this agreement with O'Brien having more-than-adequate knowledge and awareness of the risks and liabilities appurtenant to competing in NCAA Division-I collegiate sports. The Radojevic matter was not the first problem to hit the OSU campus. The tradition and legacy of OSU and its sports team, however, has survived, and will continue to do so. The judgment of the Ohio Court of Claims is hereby affirmed.
Judgment affirmed.
 BOWMAN, J., concurs. FRENCH, J., dissents.
BOWMAN, J., retired of the Tenth Appellate District, assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution.
[1] The NCAA's member institutions are divided into three divisions (I, II, and III), by size. Division-I schools are the larger universities, while Division-III institutions are the smaller colleges, community colleges, etc. OSU, being one of the largest institutions in the United States, belongs to Division-I.
[2] An "unofficial visit" is a recruiting visit initiated by the player or prospective student-athlete, and is not solicited or sponsored by the university; thus, the athletics department does not pay for or reimburse the athlete for travel or expenses relating to the trip.
[3] Formerly part of Yugoslavia.
[4] See, generally, Jane Perlez, U.S. Finds No One to Back AmongMilosevic's Foes, N.Y. TIMES (July 12, 1999), at A8. Although Serbia remained relatively peaceful throughout the Yugoslav-Bosnia-Croatia conflict that erupted during President Clinton's first term, beginning in 1998, tension worsened in Kosovo where the Serbs were battling Yugoslav security forces and the Kosovo Liberation Army. The Serbian attacks in Kosovo prompted a NATO aerial bombardment lasting 78 days.
[5] See NCAA Bylaw 12.1.1, Amateur Status, in 2006-2007 NCAA Division-I Manual (Aug. 1, 2006), available at www.ncaa.org, at Membership Publications. An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
"(a) Uses his * * * athletics skill * * * for pay in any form in that sport;
"(b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate
athletics participation;
"(c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal
enforceability or any consideration received;
"(d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial
assistance from a professional sports organization based upon athletics skill or participation, except as
permitted * * *;
"(e) Competes on any professional athletics team and knows (or had reason to know) that the team is a
professional athletics team * * *, even if no pay or remuneration for expenses was received; or
"(f) Enters into a professional draft or an agreement with an agent * * * .
Id.; see, also, The Online Resource for the NCAA, About the NCAA,available at www.ncaa.org, at Membership Publications (last visited May 29, 2007); Amateur Certification Process ("In response to the NCAA membership's concerns about amateurism issues related to both international and domestic prospective student-athletes, President Myles Brand has authorized the creation of a centralized amateurism certification process.").
[6] The NLI acts as a contract between a school and a prospective student-athlete, and also serves as a notice provision to all of the other schools attempting to recruit the same athlete — so they are apprised of the athlete's commitment to attend the school designated in the NLI.
[7] See NCAA Bylaw 13.02.11.1(a) (Recruited Prospective Student-Athlete). Generally speaking, the bylaws set strict guidelines as to the amount of time a recruit can spend at the school, what kinds of activities they can participate in, and how much money the school is allowed to spend on such activities. All details of an official visit are documented and reported to the NCAA. (Tr. 652-654.)
[8] OSU contended that the loan was a blatant or egregious violation of "Recruiting 101." (Tr. 608, 762); NCAA Bylaw 13.2.1.
[9] See Notice of Allegations from the NCAA Committee on Infractions to OSU (May 13, 2005). (Defendant's Exhibit No. O.)
[10] See NCAA Bylaw 12.1.1, at fn. 5.
[11] The trial court held that the subject matter of the Salyers lawsuit was not relevant to the trial sub judice; however, we note that the matter involved the men's basketball program at OSU, namely Boban Savovic, the former OSU player who had chaperoned Radojevic during his official visit in the fall of 1998. In May 2004, attorneys in the OSU athletic department were able to review deposition transcripts from the Salyers trial, which revealed Salyers' claims that she provided improper benefits to Savovic while he played basketball at OSU.
[12] Given that the NCAA is not a law-enforcement body with presence on each campus nationwide, it relies heavily on the member institutions monitoring and "self-reporting" all conduct relating to the rules promulgated by the organization. For that reason, inter alia, member institutions, like OSU, have entire offices or departments dedicated solely to overseeing university athletics and all compliance-related matters. Like OSU, compliance officers are staffed, at least in part, by attorneys trained to understand NCAA bylaws and how to keep their respective programs in compliance therewith. See, e.g., OSU Compliance Office, http://ohiostatebuckeyes.cstv.com/compliance/osu-compliance.html (last visited May 22, 2007). Presently, half of the eight paid senior staff in OSU's compliance office are lawyers. The compliance office's mission statement is also posted on its website:
"The Athletic Compliance Office is committed to a comprehensive compliance program that educates its constituents about the importance of adhering to NCAA, Big Ten, and institutional rules. Our goal is to create a `compliance conscience' within the University and throughout the community. Maintaining a commitment to compliance ensures institutional control over the Department of Athletics and furthers the mission of The Ohio State University.
"To ensure institutional control and uphold the integrity of the Department, the Athletic Compliance Office is charged with the following tasks: Education, Monitoring, Enforcement, Institutional Control."
[13] See, supra, fn. 9. A notice of allegations functions similarly to an indictment or a bill of information. (Tr. 410-418.) Dr. Swank testified that the notice of allegations is a preliminary document that is written by the NCAA department acting as the "prosecutor" of the charges against a school. Thus, the notice of allegations is not a final judgment or verdict, and does not carry the imposition of sanctions.