[Cite as *Kevin O'Brien & Assocs. Co., LPA v. PLS Fin. Solutions of Ohio*, 2024-Ohio-3170.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Kevin O'Brien & Associates Co., LPA, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 23AP-77 |
| v. | : | (C.P.C. No. 18CV-5430) |
| PLS Financial Solutions of Ohio et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on August 20, 2024

**On brief:** *Jeffrey A. Catri Co., L.P.A*, and *Jeffrey A. Catri* for appellant. **Argued:** *Jeffrey A. Catri.*

**On brief:** *Arnold & Clifford, LLP, James E. Arnold*, and *Jonathan P. Corwin* for appellee. **Argued:** *Jonathan P. Corwin.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Seeking unpaid court costs allegedly advanced under a contingency fee agreement when representing a payday lender in collections cases, plaintiff-appellant, Kevin O'Brien & Associates, Co., LPA ("O'Brien & Associates") brought claims for breach of contract and tortious interference with contract against defendants-appellees, PLS Financial Solutions of Ohio, Inc. ("PLS Ohio"), and PLS Financial Services, Inc. ("PLS") in the Franklin County Court of Common Pleas. The trial court granted PLS Ohio's motion for summary judgment on both claims. While summary judgment on the tortious interference with contract claim was proper, the trial court failed to identify genuine issues

of fact material to the breach of contract claim and improperly weighed the evidence when evaluating it.  Accordingly, we affirm in part, reverse in part, and remand.

## I.  Factual and Procedural Background

{¶ 2}  Attorney Kevin O'Brien and a partner formed O'Brien & Lease Co., LPA, in 1997.  (Dec. 21, 2020 O'Brien Dep. Vol. I at 19.)  The firm began representing Columbus Check Cashers ("CCC") "in the fall of 1997, or thereabout" in collections cases.  *Id.* at 37.  Mr. O'Brien testified that the firm entered into a contingency fee agreement with CCC that "was just a one-page document."  *Id.* at 42.  However, he did not have a copy of the agreement, and believed that it perhaps "didn't get archived" with his other fee agreements.  *Id.* at 38.

{¶ 3}  Mr. O'Brien formed a new firm, plaintiff-appellant O'Brien & Associates, in November of 1999.  *Id.* at 21-22, 29.  He testified that the firm entered into a written agreement with CCC, as had his previous firm.  *Id.* at 63-64, 70-71.  According to Mr. O'Brien, the agreement was a contingency fee agreement under which the firm paid "the face amount of the loan or the face amount of the check * * * or two-thirds of the amount of the holder in due course check" to CCC if the firm recovered such amount from a debtor through its collection efforts or litigation.  *Id.* at 43.  When initially asked if the agreement "address[ed] payment of court costs," he replied: "My recollection is no."  *Id.*  Mr. O'Brien also stated that the firm's "clients were all aware that they were supposed to be paying court costs but nobody * * * really did it.  Nobody paid it."  *Id.* at 43.  When a judgment resulted in collection, he recalled that the firm "recover[ed] the court costs from the debtors," noting that "the judgment include[d] not only the judgment amount but interest * * * plus the court costs."  *Id.*  Between 1999 and 2012, the firm never received any reimbursement from CCC for court costs.  *Id.* at 85.

{¶ 4}  At a subsequent session of the deposition, Mr. O'Brien stated that, after speaking with his attorney and reviewing documents, he was "not sure" that he had "answered [the] question right" about court costs, and stated: "I think you asked me a question about -- about the agreements I had with clients and whether there was a provision in those agreements with respect to costs, and I think I answered that in the negative and it should have been in the affirmative."  (Dec. 22, 2020 O'Brien Dep. Vol. II at 94.)

{¶ 5}  On March 1, 2012, PLS began to manage CCC's collections and the coordination of its legal services, including "firing CCC's external counsel" when

necessary.  (Ex. 1, Madsen Aff. at ¶ 3, Sept. 13, 2022 Mot. for Summ. Jgmt.)  The "exclusive authority to hire and fire collection counsel" rested with PLS.  *Id*. at ¶ 4.

{¶ 6}  Ross Kleiman, corporate counsel for PLS, contacted Mr. O'Brien to inform him that O'Brien & Associates would "need to enter into a [new] collection services agreement" if the firm wanted to "continue to do collection work" for CCC.  (Ex. 4, Kleiman Aff. at ¶ 1, Sept. 13, 2022 Mot. for Summ. Jgmt.)  According to Mr. Kleiman, "it was PLS's policy to retain only outside counsel who agreed to the terms of the collection services agreement." *Id*.

{¶ 7}  On October 3, 2012, PLS's "Collection Recovery Manager" Mike Filla sent Mr. O'Brien an email stating "please stop all action on all Cincinnati, Columbus, and Cleveland Check Cashing stores." (Ex. C, O'Brien Dep.)  Mr. O'Brien responded and asked Mr. Filla to contact him "to discuss the pending cases." *Id*.  Mr. Filla replied: "I was told to have you stop all activity on these accounts as we have no way to know balances and validate these debts.  Any questions please contact Ross Kleiman general counsel for PLS." *Id*.

{¶ 8}  Mr. O'Brien denied receiving these emails or responding to them.  (O'Brien Dep. Vol. II at 122-23.)  In his version of events, Mr. Kleiman called him on March 14, 2012, and said that he was going to send Mr. O'Brien a new agreement:

> During the March 14, 2012, telephone conversation with Kleiman, Kleiman told me that he wanted me to execute a new, written, contingent fee agreement; Kleiman advised that the new agreement required me to pay CCC's court costs; I told Kleiman that I already had a written, contingent fee agreement with CCC, but that I would consider paying CCC's court costs, etc., if CCC would reimburse me for my out-of-pocket expenses; I also told Kleiman that CCC had sent my firm approximately 9700 cases and there was a long history between CCC and my firm; Kleiman said he would send the agreement for my review; I never received the new, written, contingent fee agreement from Mr. Kleiman.

(Unnumbered Ex., O'Brien Aff. At ¶ 13-14, Oct. 18, 2022 Memo in Opp.)

{¶ 9}  On October 15, 2012, Mr. Filla sent Mr. O'Brien an email with an attachment titled "Legal Services Agreement – Collections." (Ex. B, O'Brien Dep.)  Mr. O'Brien disputed receiving this email and stated that he never received a new agreement from PLS. (O'Brien Aff. At ¶ 14.)  When deposed, Mr. O'Brien was presented with a motion to

withdraw as counsel in a collection case in which his firm had represented CCC that had been filed on May 6, 2014. (O'Brien Dep. Vol. II at 133.) The memorandum in support of the motion stated that several months after PLS had acquired CCC, "Plaintiff's Counsel was presented with a 'legal services agreement - collections' ('LSA'), governing the collection of PLS' receivables. This LSA required Plaintiff's Counsel to advance and pay all of the court costs associated with PLS's collection cases." (Ex. E, O'Brien Dep.) Although his signature appeared on the motion, Mr. O'Brien insisted that he had "never received" such an agreement from PLS and was "not sure" that he had even written the memorandum. (O'Brien Dep Vol. II at 134.)

{¶ 10} After October of 2012, CCC sent no more cases to O'Brien & Associates. (Aug. 4, 2022 O'Brien Dep. Vol. III at 55-56.) However, the firm continued to perform collection activities on behalf of CCC, which cashed the checks it received. (*Id*. at 59; O'Brien Dep. Vol. II at 138-40; Hulls Dep. at 129, 132-33.)

{¶ 11} In August of 2014, PLS's parent company acquired CCC, and in 2016, changed the name of CCC to PLS Financial Solutions of Ohio, Inc. (Madsen Aff. at ¶ 11.) PLS continued as the company's litigation manger, with the same "authority to hire and fire collection counsel" that it had before the acquisition. *Id*. at ¶ 12. Acting on this authority, Ms. Madsen sent O'Brien & Associates a letter on November 14, 2017, ordering the firm to "cease and desist from all collection or other activities" on behalf of CCC. (Ex. D, Madsen Aff.) The letter stated that the firm's activities "have been without the knowledge of CCC or its corporate parent, and without any communications with CCC or its corporate parent, for at least five years." *Id*.

{¶ 12} Mr. O'Brien testified that his firm continued to collect on behalf of CCC after receiving Ms. Madsen's letter. (O'Brien Dep. Vol. II at 140-41, 159-61.) She sent another letter on February 16, 2018, describing the firm's actions as "astonishing," stating:

> To reiterate: You and your law firm are to immediately cease and desist from all activities purporting to be on behalf of CCC. Neither you, nor your law firm, represent CCC. Nor have you, or your law firm, been authorized to represent CCC for at least the past five years. Your position that you have not yet been "terminated" as CCC's counsel is specious, as there is no attorney client relationship to terminate.

(Emphasis sic.) (Ex. E, Madsen Aff.)

{¶ 13} Believing that Ms. Madsen was "part of the problem and not part of the solution," and that "she didn't represent" CCC, Mr. O'Brien decided to "communicate directly" with the company's owners. (O'Brien Dep. Vol. II at 143.)  In a May 16, 2018 letter to PLS, he lamented the "recent unpleasantness" with Ms. Madsen, accused her of filing "inaccurate affidavits" in cases where his firm claimed to represent CCC, and demanded $163,230.50 in unpaid court costs the firm had expended during its representation of PLS.  (Ex. H, O'Brien Dep. Vol. II.)

{¶ 14} O'Brien & Associates filed suit against PLS and PLS Ohio on June 25, 2018, then amended the complaint twice.  The Second Amended Complaint was deemed filed as of November 21, 2018, based on the trial court's ruling granting the motion for leave to file the pleading.  (Nov. 21, 2018 Decision & Entry at 8.)  The operative complaint stated two claims.  In the first claim, for breach of contract, O'Brien & Associates asserted that it had "a written contingent fee agreement with CCC but, at present, cannot locate that agreement," and alternatively that in the absence of the written agreement, "it had a valid contract with CCC, which is not in writing, for the provision of legal services which began in 1997 and continued, uninterrupted, at least through November 14, 2017."  (Nov. 21, 2018 Second Am. Compl. at ¶ 22-23.)  Mr. Kleiman allegedly "asked" the firm "to continue to render legal services to PLS and to continue collecting CCC's cases as normal" on March 14, 2012.  *Id.* ¶ at 25.  The firm disputed the October 2012 date as the cessation of its representation of CCC, alleging instead that "CCC, now PLS, Ohio, terminated its relationship" with the firm on November 14, 2017.  *Id.* at ¶ 27, 29.  In any case, O'Brien & Associates alleged that "from 1997 through November 14, 2017, [it had] advanced, or loaned, court costs to CCC on CCC's cases in accordance with the parties' contract."  *Id.* at ¶ 28.  The firm also alleged that PLS Ohio had "failed and refused to reimburse" it for court costs amounting to $112,230.20.  *Id.* at ¶ 31-36.  Alternatively, the firm claimed that it was entitled to recover this amount on the basis of quantum meruit.  *Id.* at ¶ 39.

{¶ 15} The second claim alleged that PLS had "tortiously interfered with the contract" between O'Brien & Associates and PLS Ohio (as the successor-in-interest to CCC).  *Id.* at ¶ 41.  This allegedly occurred when Ms. Madsen had "supplied a perjurious affidavit" in a collection action filed by the firm in 2015 in support of a motion to vacate the

judgment filed by the debtor. *Id.* at ¶ 46. The affidavit allegedly stated that O'Brien & Associates did not represent CCC, PLS, or PLS Ohio when filing the action, and those entities did not know about the action until November of 2017. *Id.* The firm alleged that PLS had "purposefully acted to procure the breach of contract between" PLS Ohio and itself in order to avoid liability for unpaid court costs. *Id.* at ¶ 50. In addition, O'Brien & Associates alleged that PLS and its attorney, Beth Miller, had "improperly instituted disciplinary proceedings against" Mr. O'Brien as leverage to force him "to dismiss the instant lawsuit," thereby appropriating "the disciplinary process and the sanction process in Ohio for an improper purpose." *Id.* at ¶ 53. As relief, the complaint sought $112,230.20 for the unpaid court costs, prejudgment interest, punitive damages, and attorney fees and costs. *Id.* at ¶ 15.

{¶ 16} After discovery completed, PLS and PLS Ohio also filed a motion for summary judgment on both the breach of contract and the tortious interference with contract claims. They agreed that there was "no dispute" concerning the existence of a "contingency fee agreement" between O'Brien & Associates and CCC. (Sept. 13, 2022 Mot. for Summ. Jgmt. at 6.) They noted that in the absence of a written agreement, the firm relied "solely on the self-serving testimony of Mr. O'Brien, provided decades after the fact," to prove that the agreement required the client to reimburse the firm for unpaid court costs. *Id.* Instead, they argued, "the parties' long-standing course of dealing" demonstrated what the parties had actually agreed to: "a true contingency fee arrangement with respect to court costs." *Id.* at 7. Citing Mr. O'Brien's deposition, PLS and PLS Ohio pointed out that the firm had never invoiced CCC for unpaid court costs in closed, uncollectable cases, and CCC had never once paid any such costs. *Id.* at 8.

{¶ 17} PLS and PLS Ohio also argued that any attempt to recover court costs incurred before June 25, 2012, was time-barred by R.C. 2305.07, the statute of limitations governing contracts not in writing. *Id.* at 9. They clarified that they did not admit the "purported existence" of a written fee agreement that Mr. O'Brien had failed to produce, only "an oral agreement based on the parties' course of conduct * * *." *Id.* Because any "claim for repayment of court costs accrued on the date that the court costs were incurred," court costs incurred on any such date six years before filing suit were time-barred, PLS and PLS Ohio argued. *Id.* at 10. They also argued that any court costs incurred after October 3,

2012, were not recoverable because the undisputed evidence showed that the representation of CCC terminated on that date. *Id.* In support of this argument, they pointed to Mr. O'Brien's admission that he knew he had to sign a new agreement to continue representing CCC, but did not sign one, as well as a court filing he signed in 2014 stating his refusal to enter into a new agreement with PLS. *Id.* They also argued that issue preclusion demonstrated that the firm did not have the authority to represent CCC in a lawsuit filed on March 24, 2016, because a jury had found so in a federal court case filed under the Fair Debt and Collection Practices Act by a debtor against O'Brien & Associates. *Id.* at 11.

{¶ 18} Additionally, PLS and PLS Ohio argued that the doctrine of laches barred any recovery because the firm had never billed CCC for court costs for over a decade, then waited six years after the termination of representation before filing a suit to recover the costs. *Id.* at 12. This amounted to an unreasonable delay, they argued, with no explanation for it, that "prejudiced" PLS and PLS Ohio because they "were not the contracting parties, none of the CCC personnel who might have had interactions with" the firm or "pertinent documents from those interactions" were available any longer. *Id.* at 13.

{¶ 19} The "brief reference" to recovery under a theory of quantum meruit in the Second Amended Complaint did not amount to assertion of a claim under that theory, and Mr. O'Brien admitted as much in his deposition. *Id.* at 13. Nevertheless, PLS and PLS Ohio addressed the theory and argued that recovery in quantum meruit arising from a contingency fee agreement depended " 'upon successful occurrence of the contingency,' " which did not occur in cases where the firm collected nothing from a debtor. (Emphasis omitted.) *Id.*, quoting *Reid v. Lansberry*, 68 Ohio St.3d 570 (1994), paragraph two of the syllabus.

{¶ 20} Finally, PLS and PLS Ohio challenged the tortious interference with contract claim because PLS did not interfere with CCC's agreement with O'Brien & Associates. *Id.* at 14. Rather, terminating the representation was "precisely what CCC hired [PLS]" to do. *Id.* "As the manager of CCC's legal affairs, PLS simply exercised CCC's right to terminate the agreement." *Id.* In a tortious interference with contract claim, such a right amounted to a privilege that shifted the burden to the firm to show, by "clear and

convincing evidence, that [PLS] acted with actual malice." (Emphasis omitted.) *Id.* However, no evidence demonstrated such intent.[1] *Id.*

{¶ 21} The trial court granted PLS and PLS Ohio's motion on January 3, 2023. Its discussion of the breach of contract claim focused on the parties' "conduct and course of dealing," agreeing with PLS and PLS Ohio that in the absence of a written agreement, it "demonstrate[d] the true and mutually agreed upon terms of the contingency fee agreement." (Jan. 3, 2023 Decision & Entry at 7.) The trial court reasoned:

> Defendants' account of the party's course of dealings is uncontroverted by Plaintiff. While Plaintiff argues that Attorney O'Brien always advanced and/or loan court costs to his clients with the understanding that those court costs would eventually be repaid, there are no written contracts or other accounts available to [verify] that CCC and/or Defendants mutually assented to those terms. Moreover, without more corroborating evidence, Attorney O'Brien's affidavit testimony that, the contingency fee agreement with CCC required his reimbursement of court costs, is unpersuasive. * * * The course of dealing between the parties for over a decade most accurately reflects the agreement between the parties.

*Id.*

{¶ 22} The trial court also dismissed the tortious interference with contract claim, noting that evidence showed only that PLS "attempted to terminate the contingency fee agreement" multiple times between 2012 and 2018, but no evidence showed that PLS or PLS Ohio "acted with malice and lack of justification." *Id.* at 8.

{¶ 23} O'Brien & Associates timely appealed, asserting the following assignments of error:

> I. THE TRIAL COURT ERRED WHEN IT SUSTAINED THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.
>
> II. THE TRIAL COURT ERRED WHEN IT FAILED TO SUSTAIN THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST PLS FINANCIAL SOLUTIONS OF OHIO, INC., FOR LIABILITY, ONLY.

---

[1] The motion also addressed the request for punitive damages, which the trial court mentioned in its dismissal of the tortious interference with contract claim. O'Brien & Associates did not assign the dismissal as error or address it in this appeal.

III. THE TRIAL COURT ERRED WHEN IT DISMISSED THE PLAINTIFF'S CLAIM FOR TORITOUS INTERFERENCE WITH CLAIM [*sic*] AGAINST DEFENDANT, PLS FINANCIAL SERVICES, INC., ONLY.

## II. Standard of Review

{¶ 24} When reviewing the decision of a trial court granting or denying a party's motion for summary judgment, an appellate court applies a de novo standard of review. *Smathers v. Glass*, 172 Ohio St.3d 84, 2022-Ohio-4595, ¶ 30, citing *A.J.R. v. Lute*, 163 Ohio St.3d 172, 2020-Ohio-5168, ¶ 15. This standard requires "an independent review of the evidence without deference to the trial court's findings." *Id.*, citing *Wilmington Sav. Fund Soc., FSB v. Salahuddin*, 10th Dist. No. 19AP-190, 2020-Ohio-6934, ¶ 20. The "appellate court must use the same standard of review as the trial court," applying "the standard set forth in Civ.R. 56, as well as that stated in applicable case law." *Salahuddin* at ¶ 20.

{¶ 25} Under Civ.R. 56, a party may move the trial court for summary judgment. "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). Summary judgment will be granted when "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." *Id.* "The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 294 (1996). Once the movant has so demonstrated, "an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response * * * must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E).

## III. First and Second Assignments of Error

{¶ 26} O'Brien & Associates argues that the trial court did not construe the evidence "in a light most favorable" to it and that much of the evidence in this case remains in dispute. (Brief of Appellant at 13.) The firm argues that its contingent fee agreements, as

well as those of Mr. O'Brien's previous firm, complied with the pre-1999 mandate in the Ohio Code of Professional Responsibility that "an attorney could advance, but not be ultimately responsible for, the payment of court costs." *Id.* at 18 (citing DR 5-103(B)). The trial court failed to "discuss the law regarding contingent fee agreements" or Mr. O'Brien's testimony stating that none of his firms ever agreed to have ultimate responsibility for court costs advanced on behalf of a client. *Id.* at 17, 19. The firm also argues that the trial court improperly relied upon the parties' course of conduct to the exclusion of other evidence, including Mr. O'Brien's testimony. *Id.* at 20. Although the course of conduct demonstrated that O'Brien & Associates never invoiced CCC for court costs, Mr. O'Brien testified that he "talked" with CCC representatives about the costs, but "[t]he trial court overlooked this testimony." *Id.* at 22. In the firm's opinion, "the trial court largely ignored O'Brien's testimony and affidavits," and instead improperly evaluated them for credibility. *Id.* at 24.

{¶ 27} In response, PLS and PLS Ohio argue that O'Brien & Associates cannot produce any admissible evidence showing that the original agreement between the firm and CCC required the latter to ultimately reimburse the firm for court costs advanced in collections cases. (Brief of Appellees at 12.) Because "the supposed written agreement" has never surfaced, they argue that the trial court properly looked to the course of performance to determine the actual terms of the agreement. *Id.* at 13-14. And that course of performance, undisputed by O'Brien & Associates, demonstrates that the firm never "invoice[d] CCC for court costs," nor did CCC pay the firm for any advanced costs. *Id.* at 15. In addition, PLS and PLS Ohio assert that the firm's arguments about the previous disciplinary rule addressing court costs "is premised on impermissible inference stacking." *Id.* at 17. They also point out that the full recovery of court costs in approximately 80 percent of the cases "highlights the true contingency nature of the relationship between [the firm] and CCC." (Emphasis omitted.) *Id.* at 18. Statements made by former CCC employees are inadmissible hearsay, they argue, because "the party-opponent exclusion from the hearsay rule is inapplicable to successors in interest." *Id.* at 19. Finally, they argue that the "reliance on the self-serving uncorroborated affidavit and testimony of Mr. O'Brien, which is contradicted by undisputed course of conduct evidence, is insufficient to survive summary judgment." *Id.* at 20.

{¶ 28} The breach of contract claim brought by O'Brien & Associates alleges that its contingent fee agreement with CCC required the latter to reimburse the firm for all advanced court costs, and that CCC and its successor in interest, PLS Ohio, breached the agreement by failing to pay court costs advanced in collection cases where the firm never recovered from defendant debtors. " 'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik* at ¶ 16, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). To be enforceable, a contract's terms "must be definite and certain." *Episcopal Retirement Homes* at 369, citing *James Ward & Co. v. Wick Bros. & Co.*, 17 Ohio St. 159, 164 (1867). It is undisputed that neither CCC nor PLS Ohio ever reimbursed O'Brien & Associates for court costs advanced in unsuccessful collection cases. Rather, the parties disagree on the issue of whether the agreement contained a term that required CCC to reimburse the firm for court cost advanced in collection cases. As PLS and PLS Ohio stated when moving the trial court for summary judgment, "[t]here is no dispute that [O'Brien & Associates] had a contingency fee agreement with CCC. The dispute lies in whether that contingency fee agreement addressed the payment of court costs by CCC." (Sept. 13, 2022 Mot. for Summ. Jgmt. at 6.)

{¶ 29} "Under Ohio law, to prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of, and terms of, a contract; (2) performance by the plaintiff; (3) non-performance by the defendant; and (4) damages caused by defendant's breach." *O'Brien v. Ohio State Univ.*, 10th Dist. No. 06AP-946, 2007-Ohio-4833, ¶ 44. In this case, the breach of contract claim hinges on the first element. O'Brien & Associates must prove that the terms of the contingent fee agreement entitled it to reimbursement for all advanced court costs during the representation, not just costs recovered in successful collections cases. Seeking summary judgment, PLS and PLS Ohio assert that they are entitled to judgment as a matter of law because the agreement did not include such a

term. Their initial burden on summary judgment is to show that there is no evidence to prove, or that the undisputed evidence does not prove, that the contingency fee agreement required CCC to pay O'Brien & Associates for court costs advanced by the firm. Arguing that the firm "has been unable to produce that written agreement" and discounting Kevin O'Brien's testimony as "self-serving," they attempt to fulfill this burden by pointing to "the course of dealing between [the firm] and CCC," asserting that it "clearly establishes a true contingency fee arrangement with regard to court costs." (Sept. 13, 2022 Mot. for Summ. Jgmt. at 7.) That course of conduct, which is not in dispute, demonstrates that the firm never invoiced CCC for court costs it had advanced in unsuccessful collection cases, and that it only recovered court costs after successful collections. *Id.* (*See also* O'Brien Dep. Vol. II at 78, 85.)

{¶ 30} In several contexts, parties' course of performance may serve as evidence of their agreement's terms. Course of performance may demonstrate the parties' intent to modify terms of an existing agreement. *See St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 39 (affirming appellate court's holding that looked to parties' course of performance to determine terms of an ambiguous agreement and subsequent modification). *See also RotoSolutions, Inc. v. Crane Plastics Siding, LLC*, 10th Dist. No. 13AP-1, 2013-Ohio-4343, ¶ 21 (where plaintiff alleged that defendant had "waived the no written modification provision unless signed by both parties by means of [a] letter and the parties' subsequent course of dealing," plaintiff had adequately stated "a valid claim for breach of contract"). In addition, course of performance may aid when interpreting a contract with ambiguous or disputed terms. *See St. Marys* at ¶ 11 (noting that the appellate court had found that "the parties' course of conduct gave meaning" to an ambiguous agreement"). Uncertain terms of an oral contract may also be shown by pointing to "the parties' words, deeds, acts, and silence." *R&A Lawn Care, LLC v. Back*, 1st Dist. No. C-160682, 2017-Ohio-4404, ¶ 16, citing *Kostelnik* at ¶ 15.

{¶ 31} In this case, course of performance is offered not to demonstrate an intent to modify previous terms, to interpret an unclear agreement, or as evidence of an oral agreement. Instead, PLS and PLS Ohio point to the course of performance as undisputed evidence of the original terms of a missing agreement. Because O'Brien & Associates only recovered court costs advanced to CCC in successful collections cases, PLS and PLS Ohio

argue that the agreement's terms must have only entitled the firm to recovery in successful cases. The conclusion they advance requires making the inference that the agreement distinguished between successful and unsuccessful collections and only allowed the firm to recover costs when it collected. Thus, one inference is that the course of performance demonstrates the actual terms of the agreement. However, competing inferences also arise. For example, as a pragmatic business decision, the firm may have not pursued the costs allowed by the agreement in all cases in order to maintain a harmonious working relationship with its client, and only chosen to pursue such costs after the relationship deteriorated. As Mr. O'Brien testified, his firm was "getting so much business, especially before 2009, that * * * [he] was not terribly concerned at that time about the court costs." (O'Brien Dep. Vol. I at 78.) Another possible inference is that even if the agreement allowed for recovery in all cases, the course of performance demonstrates the firm's irresponsible and dilatory invoicing practices, as it only bothered to reimburse itself for costs in cases that resulted in an actual cash flow from debtors. Because any of these inferences arises from examining the course of performance, and these inferences suggesting contradictory evidence of the fee agreement's terms, those actions do not demonstrate undisputed evidence the actual terms concerning costs. Furthermore, the standard of review requires that evidence on summary judgment be "construed most strongly" in favor of the nonmoving party. Civ.R. 56(C). Here, the trial court only made the inference that disfavored the nonmoving party's position on the agreement's actual terms. For these reasons, the parties' course of conduct does not satisfy the initial burden that PLS and PLS Ohio carried to demonstrate the absence of a genuine issue of material fact on the disputed term of the fee agreement, as summary judgment requires. *Id.*

{¶ 32} PLS and PLS Ohio emphasize the parties' course of performance to prove the terms of the contingent fee agreement, but the Ohio Rules of Evidence directly address the evidentiary problems that arise from a missing written agreement. "Generally, in order to prove the content of a writing, the original writing is required." *Criswell v. Criswell*, 3d Dist. No. 9-11-57, 2012-Ohio-3065, ¶ 24, citing Evid.R. 1002. *See also Flaim v. Med. College of Ohio*, 10th Dist. No. 04AP-1131, 2005-Ohio-1515, ¶ 14 ("In order to prove the contents of a writing, the 'best evidence rule' requires that the actual document, or an exact duplicate thereof, be introduced."). Under the best evidence rule, "the original writing" is

required to prove its contents, "except as otherwise provided in [the] rules" or by statute. Evid.R. 1002. "The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if * * * [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith * * *." Evid.R. 1004. A party is permitted "to introduce secondary evidence of the agreement's terms" when it has been lost, including the party's own "testimonial evidence." *Criswell* at ¶ 22-23, 25 (reversing summary judgment where trial court had ruled that missing agreement barred a breach of contract action under the statute of frauds because the plaintiff, who testified that a "ten-year lease agreement was in writing" and was unavailable because the defendant had stolen it, could prove its existence under Evid.R. 1002, 1004 and 1008).

{¶ 33} Here, Mr. O'Brien's affidavit states that "all" of his firms' "contingent fee agreements, including the contingent fee agreement with [CCC], stated that I would advance court costs and other expenses for the client, but that the client would remain ultimately responsible for the payment of court costs * * *." (O'Brien Aff. at ¶ 8.) His deposition testimony ultimately stated the same.[2] (O'Brien Dep. Vol. II at 94.) Apart from these statements, the record contains a filing signed by Mr. O'Brien and filed on May 6, 2014, moving to withdraw as counsel in a collection case on the grounds that the firm was owed "a great deal of money for court costs and other expenses advanced" by his firm that CCC, and subsequently PLS, refused to pay. (Ex. E, O'Brien Dep.) The filing also asserted that PLS had demanded that the firm enter into a new agreement that would have required it "to advance and pay all of the court costs" in collection cases, which Mr. O'Brien refused to sign. *Id.* When this evidence is "construed most strongly" in favor of O'Brien & Associates, as summary judgment requires, genuine issues of material fact arise as to what the agreement actually required. Civ.R. 56(C).

---

[2] Although Mr. O'Brien initially testified that the agreement did not address court costs, he later corrected himself during the deposition and his affidavit is consistent with the correction. To the extent that "an affidavit appears to be inconsistent with a deposition" of a nonmovant on summary judgment, "the court must look to any explanation for the inconsistency. We do not say that a nonmoving party's affidavit should always prevent summary judgment when it contradicts the affiant's previous deposition testimony. After all, deponents may review their depositions and correct factual error before the depositions are signed." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 27. Thus, the affidavit does not present an inconsistency that is sufficiently grave to invoke *Byrd*'s holding that "an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment." *Id.* at ¶ 28.

{¶ 34} In addition, when one of the three preliminary questions of fact identified in Evid.R. 1008 arises, "the issue is for the trier of fact to determine" instead of the court, as Evid.R. 104 "ordinarily" requires. Evid.R. 1008; *see also* Evid.R. 104(B) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."). Evidence Rule 1008 states that "when an issue is raised (a) whether the asserted writing ever existed, or (b) whether another writing, recording, or photograph produced at the trial is the original, or (c) *whether other evidence of contents correctly reflects the contents*, the issue is for the trier of fact to determine as in the case of other issues of fact." (Emphasis added.) "This rule provides additional support for the denial of the motion for summary judgment" because the parties dispute whether Mr. O'Brien's testimony accurately reflects the terms of the contingent fee agreement. *Criswell* at ¶ 24 (applying Evid.R. 1008 when reversing grant of summary judgment where "the parties dispute whether there was an agreement" at all). *See also Castle Hill Holdings, LLC v. Al Hut, Inc.*, 8th Dist. No. 86442, 2006-Ohio-1353, ¶ 40 (holding that grant of summary judgment on breach of contract claim was error where parties disputed issue of "whether a written contract ever existed, [as] such question is properly submitted to the jury under Evid.R. 1008").

{¶ 35} PLS and PLS Ohio argue that Mr. O'Brien's assertion that the contingent fee agreement conformed to section DR 5-103(B) of the Ohio Code of Professional Responsibility, which, when in effect, prohibited a lawyer from guaranteeing litigation expenses such as court costs, is "irrelevant" and improperly relies on "inference stacking." (Brief of Appellees at 16-17.) They argue that it is irrelevant because Mr. O'Brien's statement concerned "a purported agreement between a separate legal entity (O'Brien & Lease) and CCC in 1997," and that entity is not a party to this case. *Id.* at 16. Nor does the breach of contract claim arise from that agreement, but a later one between O'Brien & Associates and CCC. *Id.* They describe the "impermissible inference stacking" as follows:

> Appellant suggests that Ohio's ethical rules did not permit an attorney to pay court costs for a client in 1997, and therefore O'Brien & Lease's agreement with CCC did not do so— inference number one. Of course, Appellant has not submitted a copy of that agreement to validate the inference. Rather, Appellant takes that inference and builds upon it, arguing that

because that agreement would have required CCC to directly repay court costs, the subsequent agreement between Appellant and CCC would have also required repayment— inference number two.

*Id.* at 17.

{¶ 36} Although still the law in Ohio, "the rule forbidding the stacking of an inference upon an inference is disfavored by scholars and many courts." *Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees*, 28 Ohio St.3d 13, 17 (1986) (noting the rule's "dangerous potential for subverting the fact-finding process and invading the sacred province of the jury," and therefore "caution[ing] the bench and bar against resorting to this rule too readily and without a sufficient awareness of its pitfalls"). The rule against stacking inferences "prohibits only the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts." *Donaldson v. N. Trading Co.*, 82 Ohio App.3d 476, 481 (10th Dist.1992), citing *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329 (1955), paragraph one of the syllabus. Here, however, the accusation of inference stacking depends upon a mischaracterization of the Civ.R. 56(E) evidence O'Brien & Associates presented in response to the motion for summary judgment, much of which is testimonial. Mr. O'Brien testified that the original fee agreement between his first firm, O'Brien & Lease, and CCC required that the client pay advanced court costs. (O'Brien Dep. Vol. II at 95.) This assertion of fact does not rely solely upon an inference from a legal rule existing in 1997, but upon the personal knowledge of Mr. O'Brien. Furthermore, the assertion that the later fee agreement between O'Brien & Associates and CCC also required the client to reimburse court costs does not depend solely upon an inference that the earlier agreement contained such a provision but is a fact Mr. O'Brien testified to. *Id.* at 97 ("It was certainly the same agreement, just a different entity on our side."). Again, Mr. O'Brien's affidavit states that "all" contingent fee agreements contained such a provision. His assertion is not "unsupported by any additional facts," as evidenced by the memorandum O'Brien & Associates submitted in support of its motion to withdraw as counsel filed in May of 2014. *Donaldson* at 481. The refusal of PLS to reimburse the firm for court costs was the asserted grounds for the motion, as well as the insistence that the firm sign a new fee agreement requiring the firm "to advance and pay all of the court costs" to continue the attorney-client

relationship. (Ex. E, O'Brien Dep.) Regardless of any inference that arises from considering the rules governing attorneys at the time of the agreement's formation, the foregoing evidence provides "additional facts" that create a genuine issue of fact about the disputed term of the agreement "without impermissibly stacking one inference upon another." *Donaldson* at 478, 481.

{¶ 37} Citing *White v. Sears*, 10th Dist. No. 10AP-294, 2011-Ohio-204, and *Pankey v. Ohio State Hwy. Patrol*, 10th Dist. No. 20AP-234, 2021-Ohio-1317, PLS and PLS Ohio also argue that any "reliance on the self-serving uncorroborated affidavit and testimony of Mr. O'Brien, which is contradicted by undisputed course of conduct evidence, is insufficient to survive summary judgment." (Brief of Appellees at 20.) Since the parties filed their briefs, this court has clarified the standard for considering a nonmoving party's affidavit under Civ.R. 56(E). *Kiser v. United Dairy Farmers*, 10th Dist. No. 22AP-539, 2023-Ohio-2136. In *Kiser*, this court acknowledged that it "has been inconsistent in its treatment of 'self-serving' statements of nonmoving parties at summary judgment, and that has resulted in the exclusion of admissible evidence appropriate for consideration at this stage of proceedings." *Id.* at ¶ 20. *Kiser* identified both *White* and *Pankey* as belonging to a line of cases holding that "a nonmovant's own uncorroborated, self-serving assertions, whether made in an affidavit, deposition, or interrogatory responses, cannot defeat a well-supported summary judgment motion." *Id.* at ¶ 23. We noted that:

> This principle imposes several requirements beyond those contained in Civ.R. 56. Civ.R. 56(C) and (E) do not impose heightened standards for evidence produced by the nonmoving party. The rule does not require either party to corroborate competent testimonial evidence made on personal knowledge. It does not prohibit either party from submitting "self-serving" evidence that conforms with the rule. * * * [This] has led to trial courts excluding otherwise valid evidence that would create a genuine dispute of material fact at summary judgment. * * *.
>
> Accordingly, we take this opportunity to reaffirm that "self-serving" testimonial evidence that conforms to the requirements of Civ.R. 56(C) must be considered by the trial court and treated as any other evidence in the record at summary judgment. To the extent that prior decisions from this court, including *White*, hold that a nonmoving party may never demonstrate the existence of a genuine issue of material

fact with "selfserving" testimonial evidence alone, they are overruled.

*Id.* at ¶ 23-24.

{¶ 38} Because PLS and PLS Ohio have shown no basis for excluding Mr. O'Brien's affidavit or deposition testimony from consideration under Civ.R. 56(C), we reject their contention that O'Brien & Associates was precluded from relying on them when responding to the motion for summary judgment, or the suggestion that they cannot counter any evidence they raise in support of the motion. Even if PLS and PLS Ohio had fulfilled their initial burden on summary judgment, O'Brien & Associates' response "set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E).

{¶ 39} The conclusion that there is evidence presenting genuine issues of material fact does not require a discussion of the alleged statements of CCC representatives recalled by Mr. O'Brien. He believes that those statements are admissions of a party opponent under Evid.R. 801(D)(2), but PLS and PLS Ohio characterize them as inadmissible hearsay. For the reasons discussed, is unnecessary to analyze these statements to conclude that summary judgment was inappropriate.[3]

{¶ 40} The trial court concluded otherwise by weighing the evidence. This was error. The trial court stated that "without more corroborating evidence, Attorney O'Brien's affidavit testimony that, the contingent fee agreement with CCC required his reimbursement of court costs, is unpersuasive." (Jan. 3, 2023 Decision & Entry at 7.) Instead, the trial court found, "[t]he course of dealing between the parties for over a decade most accurately reflects the agreement between the parties." *Id.* "When the evidence offered allows conflicting inferences, the court reviewing a summary judgment motion may not weigh the evidence." *DN Reynoldsburg, LLC v. Maurices Inc.*, 10th Dist. No. 20AP-57, 2022-Ohio-949, ¶ 17, citing *Thyssen Krupp Elevator Corp. v. Constr. Plus, Inc.*, 10th Dist. No. 09AP-788, 2010-Ohio-1649, ¶ 20.

---

[3] All analysis here is for purposes of summary judgment only, probing the evidence in the abstract to determine if it is sufficiently in dispute for a trier of fact to resolve. The admissibility of any evidence to a trier of fact remains the responsibility of the trial court. *See Criswell* at ¶ 24, fn. 1 ("In holding that the Ohio evidence rules allow for the introduction of secondary evidence to establish the existence and terms of the written agreement, we remain cognizant of Evid.R. 104, which provides that the trial court determines issues of admissibility.").

{¶ 41} The trial court also did not believe Mr. O'Brien's affidavit and found the course of conduct cited by the movants to be more probative of the fee agreement's terms. In doing so, the trial court failed to construe the evidence in favor of the nonmovant and usurped the role of factfinder. However, "[a] court cannot weigh credibility when considering evidentiary material presented in favor of, or in opposition to, a summary judgment motion." *Whiteside v. Conroy*, 10th Dist. No. 05AP-123, 2005-Ohio-5098, ¶ 75. *See also Turner v. Turner*, 67 Ohio St.3d 337, 341 (1993) (stating that "resolution of the factual dispute will depend, at least in part, upon the credibility of the parties or their witnesses, summary judgment in such a case is inappropriate").

{¶ 42} The trial court also failed to address several defenses to the breach of contract claim raised by PLS and PLS Ohio, including laches and the statute of limitations, which they have also raised on appeal. We decline to address those issues in the first instance. "Questions not addressed by the trial court generally will not be ruled on by the appellate court." *Min You v. Northeast Ohio Med. Univ.*, 10th Dist. No. 19AP-733, 2020-Ohio-4661, ¶ 30-31 (declining to address appellees' additional arguments because "the trial court did not address the remaining issues raised by appellee in its motion for summary judgment"). *See also Breazeale v. Infrastructure & Dev. Eng., Inc.*, 1st Dist No. C-220206, 2022-Ohio-4601, ¶ 16 (refusing to address statute of limitations issue when reviewing summary judgment ruling "because that issue was never considered by the trial court"). Because we conclude that the trial court's stated basis for granting summary judgment was erroneous, the first assignment of error is sustained. Furthermore, the genuine issues of material fact identified above require overruling the second assignment of error, in which O'Brien & Associates argue that the trial court erred by denying its motion for summary judgment on the breach of contract claim.[4]

## IV. Third Assignment of Error

{¶ 43} In the third assignment of error, O'Brien & Associates argues that the trial court erred when it dismissed the tortious interference with contract claim against PLS. The firm argues that PLS had no privilege to interfere with CCC's contract because PLS and

---

[4] In addition, O'Brien & Associates fails to identify or even mention any *undisputed* evidence that would entitle it to judgment of law on the breach of contract claim.

PLS Ohio are separate corporations and do not have "a parent/subsidiary" relationship.[5] (Brief of Appellant at 31-32.) Asserting that "compelling reasons" justify resuscitating the claim, O'Brien & Associates presents an exhaustive recitation of multiple interactions between Mr. O'Brien and representatives of CCC and PLS from 2012 to 2018. In this narrative, the firm claims that PLS told Mr. O'Brien that the firm "was doing 'a great job,'" that Mr. O'Brien "did not know" Mr. Filla, who purportedly fired the firm, and that Ms. Madsen "filed a bar complaint" against Mr. O'Brien for unauthorized representation "in bad faith." *Id.* at 34-37.

{¶ 44} PLS and PLS Ohio defend the trial court's grant of summary judgment on the tortious interference with contract claim by arguing that the firm cannot prove that PLS either intentionally procured a breach of the agreement between the firm and CCC, or that the action of firing the firm was not justified. Citing Mr. O'Brien's testimony, they argue that the representation "was an at-will attorney-client relationship," and therefore, "termination, for any reason, would not constitute a breach." (Brief of Appellees at 34.) Citing Ms. Madsen's affidavit, they also argue that PLS had "absolute authority" to terminate any contract with the firm, and that this evidence is "unrefuted." *Id.* at 34-35.

{¶ 45} "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995). "In order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415 (1995), paragraph two of the syllabus. If the defendant has a qualified privilege to perform the action that the plaintiff believes is tortious, "the plaintiff must clearly and convincingly show" that the defendant acted with actual malice. *A & B-Abell Elevator Co.* at 15.

---

[5] This argument contradicts the firm's allegations that PLS "acquired" CCC in "early 2012" and that CCC underwent a name change to "PLS Financial Solutions of Ohio, Inc.," as stated in the complaint and supported with attached business filings from the Secretary of State. (Second Am. Compl. at ¶ 10, 14.)

{¶ 46} As an initial matter, we note that O'Brien & Associates have failed to cite to any portion of the record in their brief when arguing that the trial court erred in granting summary judgment on the tortious interference with contract claim. (Appellant's Brief at 29-39.) When responding to a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in [Civ.R. 56], must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). Because the nonmovant "must demonstrate that a material issue of fact exists by directing the court's attention to evidentiary materials of the type listed in Civ.R. 56(C)," entry of summary judgment is appropriate when no portion of the record is cited in response to the motion. *Tonti v. E. Bank Condominiums, LLC*, 10th Dist. No. 07AP-388, 2007-Ohio-6779, ¶ 30, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996) (affirming grant of summary judgment where the "brief fails to cite to where in the record or what specific portions of appellants' affidavits support their assertion that genuine issues of material fact remain"). The firm repeatedly disputes the authority of representatives of PLS to take the actions it describes, but cites to no affidavit, deposition, or actual evidence to demonstrate the claimed dispute. "An appellate court is not required to comb through the record on appeal to search for error when appellants have failed to specify what factual issues allegedly remain for trial." *Tonti* at ¶ 30, citing *Red Hotz, Inc. v. Liquor Control Comm.*, 10th Dist. No. 93AP-87, 1993 Ohio App. LEXIS 4032 (Aug. 17, 1993). The allegation of error cannot be evaluated without considering the evidence supporting the claim. A ten-page narrative with no citation to a single fact it asserts cannot substitute. (*See*, *e.g.*, Appellant's Brief at 39 (disputing Ms. Madsen's authority to fire O'Brien & Associates on behalf of CCC), 37 (asserting that Ms. Madsen had "no firsthand knowledge of anything that happened in 2012"), and 38 (citing only the "LinkedIn page" of Ms. Madsen when asserting facts about her employment history). This failure alone justifies overruling the assignment of error. *Tonti* at ¶ 30; Civ.R. 56(E) ("If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.").

{¶ 47} Even so, the undisputed evidence cited by PLS demonstrates that it was entitled to summary judgment on the tortious interference with contract claim. A plaintiff must show "the lack of justification" for the alleged interference. *Kenty* at paragraph two

of the syllabus. Ms. Madsen's affidavit shows that PLS acquired CCC in 2014 and continued to manage the entity's litigation after changing its name to PLS Financial Solutions of Ohio. At all times, PLS had the "authority to hire and fire collection counsel," and O'Brien & Associates has pointed to no evidence that creates a genuine issue of fact concerning this authority. (Madsen Aff. at ¶ 12.) Mr. O'Brien's own affidavit states that he was advised by Mr. Kleiman that in March of 2012 PLS "had 'taken over' " CCC. (O'Brien Aff. at ¶ 11.) His assertions that Ms. Madsen "was not competent to testify about PLS * * * before her arrival at the company" are not based on personal knowledge and do not create a genuine issue of material fact concerning the attestations in her affidavit. *Id*. at ¶ 29. Nor does his affidavit create a genuine issue of material fact as to whether PLS had the privilege to terminate an agreement for legal representation between a company it acquired and a firm it no longer wished to do business with. The third assignment of error is overruled.

## V. Conclusion

{¶ 48} For the foregoing reasons, we sustain the first assignment of error and overrule the second and third assignments of error. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part. This cause is remanded for further proceedings in accordance with this opinion.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

EDELSTEIN, J., concurs.
LUPER SCHUSTER, J., concurring in part and dissenting in part.


LUPER SCHUSTER, J., concurring in part and dissenting in part.

{¶ 49} Because Kevin O'Brien & Associates, Co., LPA ("O'Brien & Associates") failed to demonstrate a genuine issue of material fact on its tortious interference with contract claim, I concur with the majority's overruling of O'Brien & Associates' third assignment of error. As to O'Brien & Associates' breach of contract claim against PLS Financial Solutions of Ohio, Inc. ("PLS Ohio"), I concur with the majority's overruling of O'Brien & Associates' second assignment of error, but I dissent from the majority's sustaining of O'Brien & Associates' first assignment of error. Thus, I would overrule all three of O'Brien & Associates' assignments of error and affirm the judgment of the trial court.

{¶ 50} Based on my review of the record, I conclude the trial court did not err in finding no genuine issue of material fact exists as to O'Brien & Associates' breach of contract claim against PLS Ohio. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). Even construing the evidence most strongly in favor of O'Brien & Associates, I find no genuine dispute exists as to whether Columbus Check Cashers ("CCC") was contractually obligated to reimburse O'Brien & Associates for costs and expenses the firm incurred in unsuccessful collection cases.

{¶ 51} As set forth by the majority, O'Brien & Associates' breach of contract claim alleges its contingent fee agreement with CCC required the latter to reimburse the firm for all advanced court costs and case expenses, and that CCC and its successor in interest, PLS Ohio, breached the agreement by failing to pay those costs and expenses advanced in unsuccessful debt collection cases. Thus, central to the dispute on this claim is whether the terms of the contingent fee agreement between O'Brien & Associates and CCC entitled the former to reimbursement for all advanced court costs and case expenses during the representation, not only those incurred in successful collection cases. The parties' course of conduct demonstrates that, in the over decadelong representation, the firm never collected or invoiced CCC for costs and expenses it had advanced in unsuccessful collection cases, and it only recovered court costs and expenses after successful collections, as part of the judgments in those cases.

{¶ 52} The majority reasons that although the undisputed course of conduct may demonstrate the agreement did not provide for O'Brien & Associates' recovery of costs and expenses advanced in unsuccessful cases, it also may reasonably demonstrate "irresponsible and dilatory invoicing." (Majority at ¶ 31.) I disagree. While this level of neglect is possible, this would seem to be highly improbable conduct from a firm retained by CCC to collect from debtors. That is, this possible inference from the evidence does not rise above speculation. The majority also finds that O'Brien & Associates may have

strategically decided not to pursue recovery of costs and expenses advanced in unsuccessful cases, despite being entitled to that reimbursement. As with the neglect theory, this alternative is speculative. The only reasonable inference is that O'Brien & Associates chose not to seek this reimbursement from CCC, for over a decade, because it knew it was not contractually entitled to that reimbursement. In opposition to this evidence of the parties' course of conduct, PLS Ohio's submitted Kevin O'Brien's affidavit stating all of his contingent fee agreements, including the firm's written agreement with CCC, which could not be located, indicated his firm would advance court costs and case expenses, but that CCC was ultimately responsible for those costs and expenses. In his submitted testimony, O'Brien did not provide, however, any explanation as to why, if CCC was ultimately responsible for the costs and expenses the firm advanced, the firm never, in its over decadelong representation of CCC, billed CCC for these costs and expenses. Nonetheless, O'Brien & Associates also argue the terms of the contract were consistent with Ohio attorney disciplinary rules in effect when the firm entered its contract, which required CCC ultimately to be responsible for these costs and expenses.

{¶ 53} Even if the disciplinary rules at the time required CCC's ultimate responsibility to pay the advanced court costs, this does not demonstrate the terms of the contract, or explain why the firm never timely billed CCC for these costs. Additionally, in my view, Kevin O'Brien's self-serving testimony regarding the terms of his firm's contractual arrangement with CCC are insufficient to create an issue of fact on the issue of whether the parties agreed that CCC would reimburse the firm for costs and expenses paid in unsuccessful collection cases. O'Brien's assertion that CCC was contractually obligated to reimburse his firm for costs and expenses in unsuccessful collection cases is wholly belied by the undisputed fact that, for over a decade, the firm never sought reimbursement from CCC for those costs and expenses. This is obviously not to say that a sworn self-serving statement cannot create a genuine issue of material fact, but under these circumstances, O'Brien's averments are insufficient to create a genuine issue of material fact because no reasonable factfinder would be convinced by his recollection of the reimbursement terms of his firm's contingent fee agreement with CCC.

{¶ 54} For these reasons, I would overrule all three of O'Brien & Associates' assignments of error and affirm the judgment of the trial court. I therefore respectfully concur in part and dissent in part.

_____